WENGER, ADMINISTRATRIX *v.* ROSINSKY ET UX.

[No. 324, September Term, 1962.]

44

*Decided June 17, 1963.*

*Motion for rehearing filed July 16, 1963, denied September 9, 1963.*

The cause was argued before BRUNE, C. J., and HENDERSON, PRESCOTT, MARBURY and SYBERT, JJ.

*Julius G. Maurer,* for appellant.

*A. Frederick Taylor,* with whom were *Martin & Taylor* on the brief, for appellees.

MARBURY, J.; delivered the opinion of the Court.

On this appeal from a decree of the Circuit Court for Baltimore County which dismissed appellant's bill of complaint filed against the appellees, the appellant claims the chancellor was clearly in error when he found that no confidential relationship existed between David Meyer Kurtz, appellant's decedent, and the appellees and that they did not "strip" the decedent of his lifetime savings before his death.

If this were a mystery story the title would undoubtedly be "The Case of the Shorn Sergeant." Master Sergeant David Meyer Kurtz was retired from the United States Marine Corps in 1945, after approximately twenty years' service. He received a seventy-five per cent disability allowance and his normal monthly retirement pay. The disability was caused by malaria, contracted by him while stationed in Haiti. Being somewhat of a "floater", since he was unmarried, he had lived in various places since his retirement.

On March 15, 1960, while living at a hotel in Baltimore, he met his sister, Mrs. Emma Wenger, at a restaurant, where, as the result of a newspaper advertisement, they discussed the advisability of his moving to a boarding house known as Ruth's Boarding House, at 9912 Finney Drive, Parkville, Baltimore County. Three days later, on March 18, 1960, he became a boarder at this boarding house owned by the appellees, paying $25 per week for room, board and laundry. Sergeant Kurtz, then sixty-one years of age, had difficulty in walking, was stooped and had to use a cane. It appears he then had $14,269.67 in a savings account in the Baltimore Federal Savings and Loan Association. In addition he owned stocks in the estimated value of $9,136.79.

In addition to Mrs. Wenger of Baltimore City, now the administratrix of his estate and appellant here, Sergeant Kurtz had a brother who lived in Pennsylvania, and another brother and half-sister whose whereabouts were not disclosed. Despite the family relationship, it does not appear that the brothers and sisters were as close to each other as is the usual case, but neither does it appear that there was any ill feeling among them.

Soon after moving into the boarding house operated by the appellees, the sergeant became quite interested in the Rosinskys and solicitous as to their financial problems. On May 10 and 13, 1960, Sergeant Kurtz closed out his savings account at Baltimore Federal by means of a $9,000 cash withdrawal and a check of Baltimore Federal drawn to his order in the amount of $5,099.67. Prior to this time, in March he had withdrawn $170, $100 of which he used presumably to pay one month's board in advance. On May 10 he turned over $7700 in cash to Mrs. Rosinsky, which she and her husband used to pay the remaining mortgage indebtedness on the boarding house. On May 17, 1960, Kurtz deposited $6299.67 in a checking account at the Equitable Trust Company, Parkville branch, and obtained a safe deposit box there, presumably for his securities. On June 8, 1960, he withdrew from the checking account $5500 and purchased eleven series H United States savings bonds. Mrs. Rosinsky's name, on June 17, 1960, was added to the safe deposit box card, so as to also give her ac-

cess to it. On June 21 Mrs. Rosinsky went with Sergeant Kurtz to the bank where an effort was made to cash the government bonds, but this failed because they had not sufficiently matured beyond the purchase date to make them eligible for cashing.

In late June 1960, after discussion with Mrs. Rosinsky about their transportation problem while Mr. Rosinsky was at work with the family car, Sergeant Kurtz indicated that Mrs. Rosinsky should go look at new cars, with a view to his purchasing one. She went to various sales agencies and obtained sales literature, which she brought home to Sergeant Kurtz. As the result of this, she selected a new 1960 Chevrolet Impala and was instructed by him to call a salesman to bring the automobile to the Rosinskys' home for inspection by Mrs. Rosinsky. She and Sergeant Kurtz approved the car and he paid $300 in cash as a down payment on account of the total purchase price of $3,076.26, and instructed the salesman to have the car serviced and delivered. On June 27, 1960, Sergeant Kurtz obtained a loan from the Equitable Trust Company for $3200 with which to pay the remainder of the purchase price of the automobile, the loan being secured by his hypothecating various shares of his stock. Title to the car was taken in Mrs. Rosinsky's name on instructions to the salesman by Sergeant Kurtz and Mrs. Rosinsky. On August 12, on instructions of Sergeant Kurtz, the securities were sold by Equitable to pay off the loan, and the excess proceeds of sale were paid to him.

On the advice of a doctor, called by Mrs. Rosinsky, he entered the Veterans Administration hospital at Ft. Howard on July 23, 1960, where he remained five days and left, against medical advice, on July 28 and returned to the Rosinsky home. While at the hospital he listed his sister, Mrs. Wenger, as next of kin to be notified in an emergency.

On September 6, 1960, he closed his checking account at Equitable and opened a joint savings account with Mrs. Rosinsky in the same bank, in the sum of $5040. Mrs. Rosinsky was present at the bank when this account was opened, as was the case on most of the occasions when banking trans-

actions occurred. The only additional deposit in this account was $260 on October 3, which brought the total to $5300.

Some time after his return from the hospital Sergeant Kurtz had Mrs. Rosinsky contact an attorney for him for the purpose of preparing his will, by which he would leave his brothers and sister, Mrs. Wenger, $1 each, the remainder of his estate to go to Mrs. Rosinsky. The draft of the will was prepared by the attorney, but was never delivered to him for execution prior to his death.

On October 12, 1960, Sergeant Kurtz became ill in his room and summoned Mrs. Rosinsky. He asked her to get a doctor, which she attempted to do, and he died within an hour. During the brief interval between the onset of his illness and his death, he handed the savings account passbook to her and told her, according to her testimony, if he "checked out" he wanted her to have it. Two days later, on Friday, October 14, she changed the savings account to her name alone, and on Monday, October 17, she withdrew the balance of $5300 in cash.

Immediately upon his death, Mrs. Rosinsky sent his body to the morgue. Having learned of Mrs. Wenger's identity when she visited the sergeant at the veterans hospital, through the aid of the police in Baltimore County and Baltimore City, she notified Mrs. Wenger of his death. She did this upon the assumption, according to her testimony, that the sister would want to claim his body and arrange for his funeral. Mrs. Wenger did this without any contribution from the Rosinskys.

Mrs. Wenger, as administratrix of Sergeant Kurtz's estate, brought this action by means of a bill in equity for an accounting and to impose a constructive trust in order to recover the amounts of money and property obtained by the appellees from Sergeant Kurtz, claiming the abuse of a confidential relationship. By way of defense, the appellees contended that the money used to pay the mortgage was in consideration for their agreement to provide him with board, lodging and care for the rest of his life; that the car was a gift to Mrs. Rosinsky for the purpose of providing her with a means of transportation for him while her husband used their car in connec-

tion with his employment; and that the joint savings account was also a gift.

The question of confidential relationship has been before this Court on numerous occasions. In *Vocci v. Ambrosetti,* 201 Md. 475, 485, 94 A. 2d 437, we stated:

> " *'The relation requires the parties to abstain from all selfish projects.* The general principle is, if a confidence is reposed and that confidence is abused, Courts of Equity will grant relief. In such cases it is not necessary to prove the actual exercise of overweening influence, misrepresentation, importunity or fraud *aliunde* the act complained of * * *. The general rule is that he who bargains in a matter of advantage with a person placing confidence in him, is bound to show that a reasonable use has been made of that confidence, *a rule applying equally to all persons standing in confidential relations to each other.'* "

In *Zimmerman v. Hull,* 155 Md. 230, 240, 141 Atl. 531, we held that outside of recognized relationships from which undue influence may be presumed, it is a question of fact and not of law as to whether a confidential relationship does exist.

Applying these basic rules to the instant case we find, contrary to the conclusion of the chancellor, that such a confidential relationship did exist between Sergeant Kurtz and Mrs. Rosinsky. Almost from the outset of the relationship as boarder and landlady, he began to repose great trust and confidence in her, as she admitted in her testimony. She accompanied him on numerous trips to banking institutions and appeared to do the talking for him in his financial transactions. He relied on her to call a doctor of her choice during his illnesses and to contact two lawyers of her selection for the purpose of preparing his will. He gave her access to his safe deposit box and opened a joint savings account with her, using only his money. All these acts indicate a strong reliance on her judgment and integrity while he was concededly in poor health and unable to transact his own business without assistance. At no time did he have the advice of counsel or inde-

pendent advice from any other source. This was far beyond a normal, business relationship between a boarder and his landlady.

If the arrangements and transactions between Kurtz and the Rosinskys were provident and in his best interests, and if appellees had not taken advantage of this confidential relationship for their own benefit, the existence of such a relationship would not, per se, be grounds for relief. However, where such a relationship does exist, and the party occupying the position of dominion or superiority, such as Mrs. Rosinsky, receives a benefit from the transaction, there is a presumption against its validity, placing upon the beneficiary the burden of showing by clear and convincing evidence that there has been no abuse of the confidence, that she acted in good faith, and that the act by which she was benefited was the free, voluntary, and independent act of the other party to the relationship. *Rice v. Himmelrich,* 222 Md. 234, 239, 159 A. 2d 647; *Masius v. Wilson,* 213 Md. 259, 265, 131 A. 2d 484. We find that the appellees did not meet this burden. Furthermore, it is clear that all these transactions were not provident as to Sergeant Kurtz. Taken together, they had the effect of stripping him of most of his life savings. At his death he retained only the United States savings bonds which had been attempted to be cashed, and which would have passed to Mrs. Rosinsky under the draft of an unexecuted will prepared for Kurtz by an attorney of Mrs. Rosinsky's selection. What we said in *Williams v. Robinson,* 183 Md. 117, 119, 36 A. 2d 547, is particularly applicable here:

> "It is a familiar doctrine that whenever there is a confidential or fiduciary relation between two parties wherein trust and confidence are reposed on one side and influence and control are exercised on the other, a court of equity will interpose on the ground of public policy to prevent the weaker party from stripping himself of his property. * * * 'If confidence is reposed, it must be faithfully acted upon and preserved from any intermixture of imposition. If influence is

acquired, it must be kept free from the taint of selfish interest, and cunning, and overreaching bargains.' "

See also 1 Story, *Equity Jurisprudence* (12th Ed.), § 308.

We, therefore, conclude that the turning over of the money to appellees to pay their mortgage was, under the circumstances, improvident as to Sergeant Kurtz, except to the extent of weekly payments accrued from May 10, 1960, when they stopped, until the time of his death on October 12, and must be returned to the administratrix of his estate. The same principle applies with reference to the cost of the automobile paid by Sergeant Kurtz. This may be accomplished by means of imposing a constructive trust in behalf of the decedent's estate on the house and automobile. Cf. *Mackey v. Davidson,* 222 Md. 197, 205, 159 A. 2d 838.

As to the passbook and joint bank account, we find that the amount withdrawn by Mrs. Rosinsky on October 17, 1960, should also be subject to the constructive trust for the benefit of the decedent's estate. The entry in the passbook was in the standard form used in a joint tenancy bank account: "David M. Kurtz in trust for himself and Ruth Rosinsky, joint owners, subject, to the individual checks, of either, the balance at death of either to belong to the survivor," which, under a long line of our decisions, starting with *Milholland v. Whalen,* 89 Md. 212, 43 Atl. 43, made the account automatically the property of the survivor on the death of the other. However, in *Tribull v. Tribull,* 208 Md. 490, 119 A. 2d 399, we held that if in such a situation the plaintiff has adduced sufficient evidence to establish a confidential relationship, the burden shifts to the defendant to show the fairness and reasonableness of the transaction. This burden, as in the instances of the other transfers of Sergeant Kurtz's personal property, was not met. The only direct evidence concerning this account was the statement of Mrs. Rosinsky that Sergeant Kurtz wanted her to become joint owner with him for his convenience. Taking this into consideration with all of the other evidence, we find that there was no showing that the creation of this joint account was fair, reasonable and provident.

For the reasons above stated the findings of the chancellor

were clearly erroneous, so that the decree must be reversed and the case remanded for further proceedings not inconsistent with this opinion.

> *Decree reversed and case remanded for further proceedings not inconsistent with this opinion. Costs to be paid by appellees.*