JOSEPH M. MIDLER, Personal Representative of
the Estate of Dorothy L. Midler v.
MIRIAM SHAPIRO et vir

[No. 69, September Term, 1976.]

*Decided October 7, 1976.*

The cause was argued before GILBERT, C. J., and MENCHINE and LISS, JJ.

*B. Marvin Potler* and *Peter M. Zimmerman* for appellant.

*Leon H. A. Pierson* and *W. Michael Pierson,* with whom was *David S. Sykes* on the brief, for appellees.

GILBERT, C. J., delivered the opinion of the Court.

Joseph Midler, personal representative of Dorothy L. Midler, his mother, seeks to have us reverse a dismissal in the Circuit Court for Baltimore County (Raine, J.) of the bill of complaint brought by Joseph against Miriam Shapiro and her husband, Martin. Joseph perceives grievous errors as having been committed by the chancellor, but our examination of the record and the applicable law leads us to a different conclusion. Accordingly, for the reasons stated *infra,* we shall affirm the circuit court.

A perusal of the record discloses that the late Dorothy Midler was married to Isadore Midler. The union produced two sons, Joseph, the appellant, and Samuel J. Midler. All parties lived in New York until Isadore's retirement in 1960, whereupon Dorothy and Isadore Midler moved to St. Petersburg, Florida. Approximately three years later, Isadore died. He left his entire estate to his widow, Dorothy Midler. Mrs. Midler continued to reside in Florida until she moved to the Baltimore area in 1970. During the seven years of his mother's widowhood that she lived in Florida, Samuel would visit her about once a year, and Mrs. Midler would, in

turn, visit her sons in their respective homes in New York State for approximately one week each. She would also spend a week at the home of her niece, Miriam Shapiro, both en route to visiting her sons and in returning to Florida.

Samuel Midler testified that upon his father's demise he aided his mother in straightening out her financial matters. This was necessary, he said, because his father had been a very dominating man and his mother ". . . knew very little of what was going on." The Florida local bank assisted Mrs. Midler after Samuel's return to New York.

When Mrs. Midler died in December, 1971, at age 78, Joseph, a member of the New York Bar, qualified as her personal representative and set about administrating his mother's estate in accordance with her will dated 1963. By the terms of the will, Joseph and Samuel were to divide the assets of the estate. As personal representative, Joseph located some fifty thousand dollars in stocks, two watches, and a house in St. Petersburg. The total estate coming into the hands of Joseph, as personal representative, was approximately $55,000. Joseph discovered there was no cash in the estate, and upon inquiry, he ascertained that the sum of approximately $40,000 had been on deposit in various banks or savings and loan associations. Two of the accounts were in the joint names of Dorothy Midler and the appellee, Miriam Shapiro, "in trust" for the other, subject to the order of either. After Dorothy Midler's death, Miriam transferred the monies to her own account. Joseph made demand for the money, but his demand was rejected, and the instant litigation resulted.

In this Court, Joseph puts four issues to us. We shall discuss each in the order in which it has been raised.

## I.

"The Chancellor's finding that there existed a confidential relationship between Dorothy L. Midler and Miriam and Martin Shapiro from the time that Mrs. Midler moved to Baltimore and lived in the Shapiros' home in July, 1970 until her death

at the age of seventy-eight on December 19, 1971 was based on substantial evidence." [1]

The evidence disclosed that Mrs. Midler and Miriam Shapiro had always been "close." Their relationship was described as being more like mother and daughter than aunt and niece. Miriam took her aunt shopping and usually provided transportation. The appellant characterized Miriam as a domineering person who ran her family affairs in the manner suggestive of a "matriarch."

Prior to Mrs. Midler's moving to Baltimore, she, on June 27, 1969, opened an account in the Baltimore Federal Savings and Loan Association. At the same time, another account, bearing the next consecutive account number, was opened in the name of Miriam and Martin Shapiro. At the trial of the instant case, Miriam denied knowing that the account was opened at that time. In September, 1971, Mrs. Midler closed her account and transferred the amount of $15,121.20 into the Shapiro account.

Shortly after moving to Baltimore in July, 1970, Mrs. Midler opened a joint account at the Equitable Trust Company in her own name and the name of Miriam. Following Mrs. Midler's death, Miriam withdrew all the proceeds therefrom, a total of $14,738.74. No other sums had been withdrawn from the account during its life span.

A similar account was opened in the Provident Savings Bank on August 24, 1970. Miriam withdrew the sum of $2,000 therefrom in November, 1971, to cover medical expenses of Mrs. Midler. The expenses totaled $800. The balance was placed in Miriam's checking account. Subsequent to Mrs. Midler's death, Miriam withdrew the balance of the monies on deposit in the Provident account, namely, $10,989.35.

It was admitted that Miriam handled the banking for Mrs. Midler and often, if not usually, made the deposits and

---

1. The contention contains a misstatement of fact. Mrs. Midler lived in the Shapiro house from July, 1970, to October 1, 1970, at which time she moved into her own apartment located near the Reisterstown Road Plaza shopping center.

wrote out the checks, although Mrs. Midler generally signed the checks.

When Mrs. Midler became ill, it was Miriam who insisted that she see a doctor. The doctor testified that Mrs. Midler did not appear to be her stated age and was alert and in control of her faculties.

Judge Raine found as a fact that a confidential relationship existed between Mrs. Midler and her niece.

It is manifest from the record that Mrs. Midler reposed confidence and trust in Miriam, else she would not have conferred upon Miriam the right to withdraw Mrs. Midler's funds, nor in all likelihood would she have created joint accounts subject to her own and Miriam's order. There is nothing in the evidence to suggest even remotely that Mrs. Midler did not comprehend the effect of a joint account.

A confidential relationship exists whenever confidence is placed by one person in another and accepted by that other person. *Lynn v. Magness*, 191 Md. 674, 684, 62 A. 2d 604, 609 (1948); *Grimes v. Grimes*, 184 Md. 59, 63, 40 A. 2d 58, 61 (1944). Such a relationship may arise where a party is, under the existing circumstances, justified in believing that the other party will not act in a manner adverse or inconsistent with the reposing party's interest or welfare. *Bass v. Smith*, 189 Md. 461, 469, 56 A. 2d 800, 804 (1948). It ". . . extends to all relations in which confidence is reposed, and in which dominion and influence resulting from such confidence, may be exercised by one person over another." *Zimmerman v. Bitner*, 79 Md. 115, 126, 28 A. 820, 821 (1894). *See also Zimmerman v. Hull*, 155 Md. 230, 240, 141 A. 531, 535 (1928); *Upman v. Thomey*, 145 Md. 347, 358-59, 125 A. 860, 865 (1924).

Absent a presumption arising out of certain relationships (*e.g.*, attorney-client, trustee-beneficiary, principal-agent), the existence *vel non* of a confidential relationship is a question of fact, not of law. *Sanders v. Sanders*, 261 Md. 268, 276, 274 A. 2d 383, 388 (1971); *Wenger v. Rosinsky*, 232 Md. 43, 48, 192 A. 2d 82, 86 (1963); *Masius v. Wilson*, 213 Md. 259, 264-65, 131 A. 2d 484, 486-87 (1957); *Zimmerman v. Hull*, *supra* at 240, 141 A. at 535.

Judge Raine, in the case *sub judice,* opined:

> "The relationship [between Mrs. Midler and Miriam Shapiro] has been described by Mrs. Shapiro and also by an independent witness, . . . as being a very close mother-daughter type of relationship, and it is clear to me that for the periods of time in question Dorothy Midler, who was in her late seventies, . . . did place a great deal of trust and confidence in her niece, just as a mother would place trust and confidence in a beloved daughter. So, I make that finding as to the existence of a confidential relationship without any doubt whatever. I think it is crystal clear based on the testimony."

Our review of the evidence leads us to conclude that Judge Raine's finding of fact was not clearly erroneous, Md. Rule 1086, if indeed he was erroneous at all. Needless to say, we reject appellees' argument that the confidential relationship between the parties was not demonstrated, and that they should not have been required to go forward with evidence showing no undue influence [2] upon Mrs. Midler.

## II.

> "The Chancellor applied an incorrect legal standard in concluding that the Equitable Trust Company and Provident Savings Bank joint accounts, established with funds of Dorothy Midler, were intended to confer the right of survivorship uon [sic] Miriam Shapiro where the Chancellor did not follow the criteria of *Whalen v. Milholland* [, 89 Md. 199, 43 A. 45 (1899),] and its progeny and disregarded undisputed evidence that the accounts were established solely so Mrs. Midler might have the assistance and aid of her trusted niece in handling financial affairs."

---

2. ". . . [W]e must guard against the acquisition of unwarranted influence, whether sought or unsought . . . ." Address by Dwight David Eisenhower, January 17, 1961.

Both the Equitable Trust account and the Provident account were titled in the names of the decedent and Miriam Shapiro as joint owners, in trust for one another, subject to the order of either and the balance upon death to belong to the survivor. Such language has been held to create a trust, the corpus of which, by operation of law, becomes ". . . the property of the survivor on the death of the other." *Wenger v. Rosinsky, supra* at 50, 192 A. 2d at 87; *Haller v. White,* 228 Md. 505, 509-10, 180 A. 2d 689, 692 (1962); *Hancock v. Savings Bank,* 199 Md. 163, 170, 85 A. 2d 770, 772 (1952); *Bradford v. Eutaw Savings Bank,* 186 Md. 127, 133-34, 46 A. 2d 284, 287 (1946); *Milholland v. Whalen,* 89 Md. 212, 218, 43 A. 43, 45 (1899). The creation of such a trust gives rise to a rebuttable presumption of its validity, and, usually, the burden is thrust upon the party seeking to rebut it. *Haller v. White, supra* at 510, 180 A. 2d at 692; *Blair v. Haas,* 215 Md. 105, 115, 137 A. 2d 145, 150 (1957); *Ragan v. Kelly,* 180 Md. 324, 330, 24 A. 2d 289, 293 (1942). When, however, a confidential relationship is shown, as in the case now before us, the burden shifts to the party seeking to uphold the validity of the trust and gift. *Wenger v. Rosinsky, supra* at 50, 192 A. 2d at 87; *Tribull v. Tribull,* 208 Md. 490, 507, 119 A. 2d 399, 408 (1956). It then becomes the duty of the donee to demonstrate ". . . that the donor understood the nature of the transaction and intended to make a gift." *Tribull v. Tribull, supra* at 507, 119 A. 2d at 408. *See Hancock v. Savings Bank, supra.*

Appellant strongly suggests that the "First Milholland Case," 89 Md. 199, 43 A. 45 (1899), is controlling because there, as here, all the funds were the donor's, who retained possession of the bank book. The Court concluded upon that proof that no gift was intended or perfected. We think the "First Milholland Case" to be inapposite. In the instant case, unlike *Milholland,* the account was in "trust form," *i.e.,* in trust for each other. The bank account in the "First Milholland Case" was not in "trust form," but read:

"Elizabeth O'Neill and Mary Whalen. Payable to the order of either or the survivor." Later, apparently without the knowledge of the donor, Elizabeth O'Neill, the words "Joint Owners" were added when that form was adopted by the

bank. Although the words "Joint Owners" were stamped upon the passbook, Miss O'Neill could not read. The Court held that a deposit of money by an owner thereof in a savings account with another person as "joint owners," payable to the order of either and the survivor of them, is not sufficient to constitute a gift to the survivor if the donor retains dominion over the passbook.

Seemingly attempting to draw an analogy between the "First Milholland Case" and that which now confronts us, appellant points to evidence tending to show that, as in *Milholland I*, Mrs. Midler retained possession of the passbooks. Even if that evidence, in the instant case, were undisputed as to that fact, the "First Milholland Case" is readily distinguishable. The evidence in the case *sub judice* is that the bank account was in the trust form sanctioned by "The Second Milholland Case," 89 Md. 212, 43 A. 43 (1899), and that it was in such form when it was opened. Mrs. Midler could read and was capable of comprehending what she was doing. No analogy may be properly drawn between the two cases. Moreover, there is no requirement that the passbook of the type of trust account used in the case now before us need be delivered to the donee in order to perfect the gift.

Appellant also invites our attention to *Pearre v. Grossnickle*, 139 Md. 274, 115 A. 49 (1921), wherein the Court said that even the use of the trust form does not create a trust unless there is evidence of a specific intent to so do. *Pearre* does not mandate direct testimony of intent on the part of the creator of the trust. We think *Pearre* is satisfied if the trier of fact is able to draw from the evidence a rational inference of the specific intent of the donor to create the trust.

Judge Raine found as a fact that Mrs. Midler intended to create the trust account, that the accounts were not mere convenience accounts made for the purpose of assisting Mrs. Midler in her everyday needs, and that Miriam did not play a ". . . role in the creation of the accounts . . . ." In short, Judge Raine was of the view that the appellees met the burden thrust upon them and demonstrated to the trier of fact that Mrs. Midler ". . . understood the nature of the

transaction and intended to make a gift." *Tribull v. Tribull,* *supra* at 507, 119 A. 2d at 408. We have carefully reviewed the record, and we are unable to conclude that Judge Raine was clearly erroneous in his finding of fact. Md. Rule 1086. We perceive no error by the chancellor.

### III.

"In the context of a confidential relationship, the Chancellor applied incorrect legal standards in concluding that Appellees met the burden of proving by clear and convincing evidence transactional fairness where he acknowledged that evidence of fairness was 'very scant' but nevertheless went on to disregard the test of *Highberger v. Stiffler* [, 21 Md. 338 (1864),] and its progeny by considering the case as if requiring proof of actual fraud and overweening influence rather than from the point of view of selfishness, unfair advantage, and unreasonable use of confidence."

*Highberger* concerned the actions of a son in the management of his mother's business affairs. By virtue of the mother's age and their close relationship, the son's will had become that of the mother. The son caused the mother to convey to him for the "nominal consideration" of six hundred fifty dollars a "house and lot in Washington County." In fact, no consideration was paid, and the mother, who could neither read nor write, did not know that she had conveyed the property to her son. The fraud practiced upon her did not come to light until the son's death, when a partition proceeding was instituted upon the son's heirs. The mother sued to vacate the deed on the ground of fraud. The mother prevailed in the trial court, and the heirs appealed. The Court of Appeals, speaking through then Chief Judge Bowie, made clear that courts of equity will grant relief where confidence is reposed and then abused. 21 Md. at 352-53. The Court went on to state that, in such cases, whenever there is ". . . no consent of two minds, but a *merger* of the principal's mind into the agent's . . . [,] . . . it is not

necessary to prove the actual exercise of overweening influence, misrepresentation, importunity or fraud *aliunde* the act complained of." *Id.* at 353. Quoting Justice Story with approval, the Court continued:

> " 'On the one hand it is not necessary to establish that there has been fraud or imposition on the client, and on the other, it is not necessarily void *ipso facto.* But the burthen of establishing its perfect fairness, adequacy and equity, is thrown upon the attorney, upon the general rule that he who bargains in a matter of advantage with a person placing a confidence in him, is bound to show that a reasonable use has been made of that confidence, — *a rule applying equally to all persons standing in confidential relations with each other.* Story's Eq. sec. 312 . . . .' " *Id.* at 353-54.

More recently, the Court of Appeals has restated the rule in simplistic terms: Once a confidential relationship is established by the evidence, a heavy burden is cast upon the person in whom the confidence was reposed to show ". . . that a fair and reasonable use has been made of the confidence, 'that the transfer of the property was the deliberate and voluntary act of the grantor and that the transaction was fair, proper and reasonable under the circumstances . . . .' " (citations omitted). *Sanders v. Sanders, supra* at 276-77, 274 A. 2d at 388; *Rice v. Himmelrich,* 222 Md. 234, 239, 159 A. 2d 647, 650 (1960); *Masius v. Wilson, supra* at 265, 131 A. 2d at 486-87.

Some of the factors the Court must consider in determining whether the "heavy burden" of demonstrating "fairness" and "reasonableness" has been met are: (1) the voluntariness of the act, *Sanders v. Sanders, supra* at 277, 274 A. 2d at 389; (2) the stripping of the donor of his or her assets vis-à-vis the incidence of control retained by the donor, *id.*; (3) the motive of the person in whom the confidence was reposed, *Rice v. Himmelrich, supra* at 239, 159 A. 2d at 650; (4) the degree to which the donor heeded the advice of the person possessed of the donor's confidence, *id.*;

(5) whether the donor acted upon independent advice, *id.* at 240, 159 A. 2d at 650; *Williams v. Robinson,* 183 Md. 117, 121-22, 36 A. 2d 547, 550 (1944); and (6) the comprehension of the donor of what he or she was doing. *Williams v. Robinson, supra* at 122, 36 A. 2d at 550.

Judge Raine, in summarizing the evidence, observed:

". . . The dead-man's statute prevents Mrs. Shapiro from testifying as to the transaction that took place between herself and the decedent, so the Court has to look at the only other evidence, and that is the testimony of Mrs. Austin. Mrs. Austin's testimony was brief, but her testimony was that Dorothy Midler was a very sharp woman, that she saw no signs that Miriam dominated her Aunt Dora, which is the way Miriam refers to Dorothy Midler, and she testified that Miriam had told her that Dorothy wanted to pay off the mortgage for her beloved niece, but that Miriam felt rather funny about it.

Now, that negatives any idea that it was Miriam who was putting pressure on to get that mortgage money; it negatives any overweening influence. In addition, Viola Austin testified that she visited the decedent and the decedent opened a conversation by demanding to know from Miriam Shapiro whether she had taken care of that mortgage. So, it seems like it was all the idea, the act, and the wish to be beneficent toward Miriam.

. . . The evidence in this case is scant for the very reason that the dead-man's statute excludes Miriam or her husband from testifying as to any transactions they had with Mrs. Midler, but I believe that if you look at all of the circumstances that can be gleaned from all of the testimony in this case that the transactions were fair and reasonable under all the circumstances. I, as the trier of the facts, am convinced of that.

On the other hand, I will confess that the

evidence in support of the Court's opinion is, to repeat, very scant by virtue of the very nature of a case of this type. Why do I think that it is fair and reasonable and provident? Well, number one, the decedent had three natural and very legitimate objects of her bounty, to wit, her two sons and the person who stood in the role of a daughter. The testimony discloses the assets owned by Mrs. Midler were in the neighborhood of one hundred thousand dollars, and she had executed a will shortly after the death of her husband in which she had left her estate to her sons equally. It made no provision whatever for Miriam.

It seems to me completely fair and reasonable that she would make some provision for Miriam. It seems to me only natural that she would want to do something for her niece who was going to do all that she could, and did all that she could, for Mrs. Midler in her last years. The evidence suggests that she really was closer to Miriam than she was to her two sons, whose contacts with their mother were limited to seeing their mother about once a year prior to the 1971 illness of the mother which brought them from New York to Maryland frequently to check into their mother's well-being. In view of the fact that they have family ties, I think it's only fair to say that during the last part of Dorothy Midler's life they did all that could have been expected by sons, but before a substantial period prior to that time they had not been as close to their mother as Miriam had gotten to be. So, it seems to me to be only natural that the decedent would want to take care of Miriam."

The repeated characterization of the evidence as being "very scant" is looked upon by appellant as a signal that appellees did not meet the burden they were required to shoulder. The term "very scant" is relative and as such does not signify that the burden has not been successfully met.

As we read the opinion of the chancellor, we are left with the belief that he was indicating that the evidence as presented crossed the threshold of "clear and convincing" but was scant in so doing. We, however, do not believe the evidence was as scant as the chancellor seemed to view it. Indeed, we think that the evidence viewed in its entirety fully justified the findings by Judge Raine.

### IV.

"The chancellor erred in admitting over objection the denial by Miriam Shapiro of participation in the subject transactions because such a denial violates the Dead Man's Statute."

Md. Ann. Code, Courts and Judicial Proceedings Art., § 9-116 provides:

"A party to a proceeding by or against a personal representative, heir, devisee, distributee, or legatee, or by or against an incompetent person, *may not testify concerning any transaction with* or statement made by the dead or incompetent person, personally or through an agent since dead, unless called to testify by the opposite party, or unless the testimony of the dead or incompetent person has been given already in evidence in the same proceeding concerning the same transaction or statement." (Emphasis added).

The statute is to be construed narrowly, *Schifanelli v. Wallace*, 271 Md. 177, 184, 315 A. 2d 513, 517 (1974); *Snyder v. Crabbs*, 263 Md. 28, 30, 282 A. 2d 6, 8 (1971); *Stacy v. Burke*, 259 Md. 390, 404, 269 A. 2d 837, 845 (1970), because it is an exception to the policy stated in Courts Art., § 9-101. It should be interpreted in the light of its history and of § 9-101. *Trupp v. Wolff*, 24 Md. App. 588, 597-98, 335 A. 2d 171, 177-178, *cert. denied*, 275 Md. 757 (1975).

With the statute and the manner in which it is to be read in mind, we now examine the happenings during the trial which give rise to the issue before us.

Over objection, Miriam Shapiro was allowed to testify that she had nothing to do with the opening of the bank accounts. The transcript discloses that the Shapiros' counsel posed a question to the witness as follows: "Did you establish these accounts or any of them?" Appellant's attorney objected on the ground that the response would be a violation of the transactional clause of the "Dead Man's Statute," and the trial judge overruled the objection. The record then reveals:

"THE COURT: . . . Did you have anything to do with establishing these accounts?

THE WITNESS: No, sir.

THE COURT: That's admissible. She is denying that there was a transaction; that is far different from saying there was one.

BY MR. PIERSON [counsel for the Shapiros]:

Q Did you ask your aunt to establish these accounts?

MR. BELSKY [counsel for Midler]: Objection.

A No, sir.

MR. BELSKY: Move to strike.

THE COURT: The question was leading, but on the other hand I think the witness is entitled to testify that she had nothing to do with the transactions, her involvement in the opening of accounts; I think she is entitled to do that. Now, you either ask her a leading question or you say —

MR. PIERSON: What?

THE COURT: What conversations did you have with the decedent about the opening of the accounts, if any, and that puts you into a position where there's an objection as to the dealings between the two of them, which would be inadmissible under the dead-man's statute. Despite the fact it's leading, the Court will overrule the

objection and let her testify that she had nothing to do with the opening of the accounts.

MR. BELSKY: May I say this for the record, Your Honor? It appears to me that what counsel is attempting to do is prove its case by this witness where the dead-man's statute is that if it's to be proven, it should be proven by a third party, and that's why we must continuously object.

THE COURT: You have your objection. I do not believe that that particular question violates the dead-man's statute.

BY MR PIERSON:

Q I think the question was, did you ask you aunt to establish any of these accounts?

MR. BELSKY: Objection.

THE COURT: There's an objection; the objection is overruled. Answer that yes or no.

THE WITNESS: State the question again.

MR. PIERSON: Read the question back.

(Whereupon, the Court Reporter reread the last question.)

THE WITNESS: No."

We think the admission of such testimony to be erroneous. While the trial judge saw a difference between "denying that there was a transaction" and "saying there was one," we fail to see that distinction. In our view, testimony that a party litigant did not participate in a transaction with a decedent is as much a violation of the statute as is testimony that they did participate and why they did so. The latter is clearly proscribed by the statute. The former is, however, but a negative approach to achieving a circumvention of that forbidden by the latter. It is impermissible. *Jones v. Selvaggi*, 216 Md. 1, 11, 139 A. 2d 246, 251 (1958).

The test for determining what is a "transaction" within the meaning of Courts Art., § 9-116, is set forth in *Ridgley v. Beatty*, 222 Md. 76, 159 A. 2d 651 (1960). The Court there said, quoting *Hollister v. Fiedler*, 17 N.J. 239, 111 A. 2d 57

(1955), ". . . that a proper test for determining what is a 'transaction with' a decedent in the statutory sense was: 'Whether, in case the witness testify falsely, the deceased, if living, could contradict it of his own knowledge.' " 222 Md. at 83, 159 A. 2d at 655. Applying that test to the case *sub judice*, it is manifest that Mrs. Midler, had she been alive, could have, of her own knowledge, testified that Miriam Shapiro was or was not telling the truth. Mrs. Midler would most certainly have been in a position, were she alive, to testify whether Miriam prevailed upon her to open all or any of the three accounts. Thus, under the test, the matter to which Mrs. Shapiro was permitted to testify was within the scope of the prohibition established by the enactment of Courts Art., § 9-116, and its ancestors.

There remains, however, the question of whether the erroneous admission of the challenged testimony was harmless. We conclude that it was. We so do because our review of the record leads us to believe that there was substantial evidence, absent that which we think violated Courts Art., § 9-116, from which the trier of fact could properly find that the confidence reposed by the late Mrs. Midler was not abused by Miriam Shapiro. We think what the Court of Appeals said in *Jones v. Selvaggi, supra* at 11, 139 A. 2d at 251, to be a perspicuous statement of our perspective of this case: "If the answers to all of the objectionable questions to . . . [Miriam Shapiro] be excluded, . . . there still remains ample relevant and admissible evidence to sustain the chancellor's conclusions for dismissing the bill of complaint."

*Decree affirmed.*
*Costs to be paid by appellant.*