736 A.2d 380

**Lawrence UPMAN, et al.**

**v.**

**Kenneth CLARKE, et al.**

**No. 1217, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Sept. 1, 1999.

J. Brooks Leahy (Dulany & Leahy, on brief), Westminster, for appellants.

Howard A. Roland, Baltimore, for appellees.

Argued before SONNER, BYRNES, and PATRICE E. LEWIS (Specially Assigned), JJ.

BYRNES, Judge.

This case arises out of the death of eighty-eight year old Genevieve Upman ("Genevieve"), on March 1, 1996. The will that was in effect at the time of Genevieve's death left her estate to a revocable trust (the "Upman Trust" or "Trust") that she created and later amended. The trust beneficiaries are Genevieve's nephew, Kenneth Clarke, and his wife, Patricia Clarke, appellees ("the Clarkes" or "Kenneth" and "Patricia").

On November 12, 1996, appellants, seven people who would have been the beneficiaries of the Upman Trust upon Genevieve's death had she not amended it, brought suit against the Clarkes in the Circuit Court for Carroll County, seeking to have the amendment to the Upman Trust set aside on the ground of undue influence.[1] At the same time, they brought a caveat proceeding in the Orphan's Court for Carroll County on the ground that Genevieve lacked capacity when she executed the will that was in force at the time of her death and that that will was a product of undue influence by the Clarkes over her.

The two actions were consolidated in the Circuit Court for Carroll County. They were tried as one, from June 10 to June 12, 1998, before a jury and by the court. The will caveat action was decided by the jury in favor of the Clarkes. The Upman Trust Amendment action was decided by the court, in its equity capacity, also in favor of the Clarkes. Appellants noted an appeal from the judgment entered in the Upman Trust Amendment action only. They present the following question for review, which we have reworded:

Did the Clarkes meet their burden of showing by clear and convincing evidence that the amendment to the Upman Trust was the independent and voluntary act of Genevieve Upman?

---

1. Appellants are: Lawrence Upman, Barbara Lee Lunsford, Mary Anne Naide, Charles Bezold, Helen Bezold, Jean Bezold, and Christine Healy.

In their brief, the Clarkes raise the following question, which we also have reworded:

> Given the testamentary character of the Upman Trust, did the trial court err in assigning to them the burden of persuasion on the issue of undue influence?

For the following reasons, we shall affirm the judgment.

## FACTS AND PROCEEDINGS

Genevieve established the Upman Trust on June 3, 1994. The Upman Trust was revocable and, at first, was funded with Genevieve's residence, located in Ellicott City, and the contents of that house. Genevieve named herself as trustee, and her nephew Kenneth and her niece Christine Healey ("Christine") (one of the appellants) as joint successor trustees. Howard Roland, Genevieve's attorney, testified that her purpose in creating the Upman Trust was to avoid having her assets tied up in probate.

The Upman Trust was designed to operate much like a will. During Genevieve's lifetime, its only beneficiary was Genevieve herself. Upon her death, however, the Upman Trust provided for her assets to be distributed as they would have been distributed under her prior wills.

In 1987, Genevieve executed a will that left her stocks and bonds to fourteen named nephews and nieces of her late husband, Adam Upman.[2] Under that will, half of the value of Genevieve's residence would go to three of the appellants in this case, Lawrence Upman, Barbara Lunsford, and Mary Ann Naide, who also are nieces and nephews of Adam. The balance of Genevieve's assets, including her bank accounts and the other half interest in her home, were to go to members of her family. Christine was named personal representative under the 1987 will.

In 1991, Genevieve executed a new will. The 1991 will added a bequest of $1,000 to her church, expanded the distribution of her stocks and bonds to a group of twenty of Adam's

---

2. Adam died in 1967. Genevieve and Adam did not have any children.

nephews and nieces, and provided for the distribution of the remainder of her property as under the 1987 will. In her 1991 will, Genevieve named Kenneth and Christine personal representatives.

On May 31, 1994, Genevieve executed a third will. This time, she bequeathed the majority of her stocks and bonds, previously earmarked for Adam's nephews and nieces, to Kenneth and Christine (after deducting $1,000 for her sisters-in-law), both of whom had been helping her to maintain her home and to conduct her business affairs. Kenneth and Christine remained personal representatives under the 1994 will. Genevieve's other assets were to be divided as before.

The Upman Trust, as executed on June 3, 1994, was drafted contemporaneous with Genevieve's 1994 will, and contained virtually identical testamentary provisions. Although the Upman Trust corpus initially consisted of only Genevieve's personal residence and its contents, the Trust nevertheless contained a provision distributing stocks and bonds to Kenneth and Christine in the same manner as in the 1994 will. Additionally, as was the case in Genevieve's prior wills, the real estate in the Trust was to be sold upon Genevieve's death, with one half of the proceeds to go to appellants Lawrence Upman, Barbara Lunsford, and Mary Ann Naide, and the remainder of Genevieve's property, with the exception of stocks and bonds, to be divided among those of Genevieve's siblings who survived her, and Kenneth and Christine.

Appellants concede that Genevieve was of sound mind and was acting independently in 1994 when she established the Upman Trust and executed her 1994 will.

In March 1995, Genevieve suffered a fall at home. She was hospitalized for eight days. Her physician during that hospitalization was Jerry Seals, M.D. Dr. Seals had been treating Genevieve since October 1993 for ailments primarily related to polymyositis, an inflammation of the muscles. Over that time, Dr. Seals made several notations in his chart about Genevieve experiencing short-term memory loss, confusion, and the onset of senile dementia. Some of these notations document reports

by family members, primarily Christine, while others reflect Dr. Seals's personal observations. When Genevieve was discharged from the hospital on March 30, 1995, Dr. Seals noted that she was to go home "to family members who understand the need for essentially 24 hour supervision due to confusion."

Genevieve was released from the hospital and into the care of the Clarkes, who took her into their home. According to several witnesses, Genevieve was especially grateful to the Clarkes for allowing her to live with them because she no longer was able to care for herself and the alternative would have been for her to move to a nursing home. After Genevieve moved in with the Clarkes, her contact with the other relatives began to diminish. Christine, who until then had visited Genevieve twice weekly, came to the Clarkes to see Genevieve just once or twice a month. The other relatives did not visit Genevieve at all. Most of them acknowledged at trial that they had not seen Genevieve in years.

Five months after Genevieve moved in with the Clarkes, she asked Patricia to contact Mr. Roland for the purpose of drafting a new will ("the 1995 will") and amending the Upman Trust. Mr. Roland made the requested changes and sent them to Genevieve. At trial, Mr. Roland was called by appellants as an adverse witness. He testified that the effect of Genevieve's 1995 will was to place all of her remaining assets into the Upman Trust and that the effect of the Trust Amendment was to leave all of her assets to the Clarkes upon her death. Genevieve remained a trustee, but the Trust Amendment made Kenneth and Patricia additional trustees. Mr. Roland explained that he did not speak with Genevieve directly about the revisions to be effected by the 1995 will and Trust Amendment. Instead, the revisions were communicated to him by Patricia. Mr. Roland testified that that was not unusual, and that Genevieve had made similar requests in the past through Kenneth and Christine. When Mr. Roland finished drafting the 1995 will and Trust Amendment, he sent them to Genevieve with a note asking her to call him if she had any questions.

Patricia testified that when the 1995 will and Trust Amendment arrived in the mail from Mr. Roland, she asked her neighbors, Lawrence and Kim Mullins, to come to the house to witness Genevieve's signature on the will. The Mullins each testified that they witnessed Genevieve sign her will and that she appeared to be competent when she did so. Patricia also testified that the Upman Trust Amendment was not signed by Genevieve when she executed her will because it required a notarized signature. On September 13, 1995, the Clarkes took Genevieve to their bank. There, Jennifer Wright, a bank employee, witnessed Genevieve sign the Upman Trust Amendment, and notarized her signature. Ms. Wright testified that Genevieve produced her medicare card for identification without being asked. Ms. Wright recalled being impressed by that action on Genevieve's part, because it would not occur to most elderly people that a notary would need such proof. According to Ms. Wright, Genevieve appeared to be mentally sound and to be acting voluntarily when she signed the Trust Amendment.

Dr. Seals testified by videotape. He explained that he last saw Genevieve in March 1995. He would not express an opinion about Genevieve's capacity to understand the 1995 will and Upman Trust Amendment. He maintained, nevertheless, that by August and September of 1995, her short term memory loss and increasing dementia likely would have made it difficult for her to keep track of her business affairs, such as paying bills and balancing her checkbook. He acknowledged that Genevieve never had any trouble remembering his name when she came to his office, however, and conceded that she had been strong willed about not wanting to move to a nursing home.

At the conclusion of the evidence and after hearing argument of counsel, the trial court ruled in favor of the Clarkes on appellants' challenge to the Trust Amendment. The parties earlier had stipulated to the existence of a confidential relationship between Genevieve and the Clarkes. The trial court ruled that the existence of that relationship had the legal effect of shifting the burden of proof to the Clarkes to show by

clear and convincing evidence that the Trust Amendment was not the product of undue influence by them over Genevieve. After reviewing factors relevant to that assessment, as set forth in *Midler v. Shapiro,* 33 Md.App. 264, 273–74, 364 A.2d 99 (1976), and applying those factors to the evidence, the trial judge concluded that "[e]verything points to the [Clarkes] providing for [Genevieve], and ... certainly, the inferences that could be gathered from all of the evidence is certainly not one where there has been undue influence for the profit of the [Clarkes]."

We shall recount additional facts as necessary to our discussion of the issues.

## DISCUSSION

### I.

Appellants contend that the evidence at trial was insufficient to support the trial court's finding by clear and convincing evidence that the Upman Trust Amendment did not result from undue influence by the Clarkes over Genevieve. The Clarkes counter that they presented sufficient evidence to satisfy the burden and high standard of proof assigned to them by the trial court. They argue in the alternative that the trial court erred in assigning the burden of proof to them and that when the evidence is considered in light of the proper burden (and standard) of proof, the trial court's ruling must be affirmed.

The Maryland cases that have addressed a challenge to an *inter vivos* transfer of property to the dominant party in a confidential relationship have held that there is a presumption against the validity of such a transfer and therefore the dominant party bears the burden of showing by clear and convincing evidence that the transaction was not the product of undue influence. In *Wenger v. Rosinsky,* 232 Md. 43, 192 A.2d 82 (1963), the Court explained:

[W]here such a relationship does exist, and the party occupying the position of dominion or superiority . . . receives a benefit from the transaction, there is a presumption against its validity, *placing upon the beneficiary the burden of showing by clear and convincing evidence that there has been no abuse of the confidence,* that she acted in good faith, and that the act by which she was benefited was the free, voluntary, and independent act of the other party to the relationship.

*Id.* at 49, 192 A.2d 82 (emphasis supplied); *see also Midler v. Shapiro, supra,* 33 Md.App. at 273, 364 A.2d 99. Appellants maintain that under these cases, the trial court properly assigned to the Clarkes the burden of proving the absence of undue influence, by clear and convincing evidence.

■ By contrast, in will caveat cases, the existence of a confidential relationship between the testator and a person taking under the will does not give rise to a presumption of invalidity. For that reason, the burden to prove undue influence remains with the person challenging the will. In *Anderson v. Meadowcroft,* 339 Md. 218, 661 A.2d 726 (1995), the Court of Appeals explained:

There is an obvious difference between a gift whereby the donor strips himself of the enjoyment of his property while living and a gift by will, which takes effect only from the death of the testator. In case of gifts by will the fact that a party is largely benefited by a will prepared by himself is nothing more than a suspicious circumstance of more or less weight according to the facts of the case.

*Id.* (internal quotations omitted).

The Clarkes maintain that the Upman Trust, as originally established and as amended, was characteristically testamentary. It was revocable and affected only Genevieve until her death. Therefore, the existence of a confidential relationship between Genevieve, as the Trust settlor, and the Clarkes, as the Trust beneficiaries, did not give rise to a presumption of invalidity of the Trust Amendment. The burden to prove that

the Trust Amendment was invalid as the product of undue influence therefore remained on appellants.

■ We agree with the Clarkes that given the nature of the Upman Trust (in its original form and as amended), appellants bore the burden of proving that the Trust Amendment was the result of undue influence, even in the face of the stipulated confidential relationship. The Upman Trust did not confer an immediate benefit on anyone other than Genevieve. Indeed, as the lifetime beneficiary, Genevieve merely continued to enjoy the benefit of assets that she previously had owned outright. The creation of the Upman Trust did not effect a transfer of assets to beneficiaries other than Genevieve herself, prior to Genevieve's death. That remained the case after the Trust was amended. Moreover, because the Upman Trust was revocable, Genevieve retained the power to change its terms at any time, just as a testator retains the ability to change the terms of his will. In this regard, Genevieve's decision to leave her assets to the Clarkes through the Upman Trust Amendment was the same in substance as if she had done so by will.

Appellants argue that the Upman Trust Amendment in fact conferred an immediate benefit upon the Clarkes because they became trustees. We disagree. Although Genevieve added the Clarkes as trustees, she did not resign her own trusteeship and indeed the evidence presented at trial showed that she continued to write checks on the Upman Trust checking account after the Upman Trust was amended.

Appellants also misread our opinion in *Midler v. Shapiro, supra,* as support for their position on the burden of proof. That case did not involve a testamentary gift. The decedent, an aunt, opened two checking accounts titled in her name and her niece's name "as joint owners, in trust for one another, subject to the order of either and the balance upon death belong to the survivor." *Midler,* 33 Md.App. at 270, 364 A.2d 99. The effect was to give the niece *immediate* access to the funds in the accounts. Under the terms of the accounts, the niece could have withdrawn the funds at any time, with or

without her aunt's consent.[3]  We explained:

> The creation of such a trust gives rise to a rebuttable presumption of its validity, and, usually, the burden is thrust upon the party seeking to rebut it.  When, however, a confidential relationship is shown, as in the case now before us, the burden shifts to the party seeking to uphold the trust *and gift*.  It then becomes the duty of the donee to demonstrate ". . . that the donor understood the nature of the transaction and intended to make a gift." *Tribull v. Tribull, supra* [208 Md. 490] at 507 [119 A.2d 399 (1956)].

*Id.* (emphasis supplied)(internal citations omitted).  We then concluded that the trial court was not clearly erroneous in finding that the niece had met the heavy burden of showing an absence of undue influence.  *Id.* at 272, 364 A.2d 99.

In contrast to the joint checking account situation in *Midler*, the transfer of assets or control from Genevieve to the Clarkes did not occur until Genevieve's death.  Genevieve remained free during her lifetime to amend the Upman Trust to redesignate the ultimate beneficiary (or beneficiaries).  Accordingly, the existence of a confidential relationship between Genevieve and the Clarkes was a factor for the trial court to consider in deciding whether Genevieve was unduly influenced by the Clarkes when she executed the Upman Trust Amendment.  Indeed, it was a piece of evidence indicative of a suspicious circumstance.  *Anderson, supra,* 339 Md. at 227, 661 A.2d 726; *Shearer v. Healy,* 247 Md. 11, 25, 230 A.2d 101 (1967)(citing *Cook v. Hollyday,* 185 Md. 656, 667, 45 A.2d 761 (1946)).  The evidence of a confidential relationship did not, however, cause the burden of proof to shift to the Clarkes to prove lack of undue influence.[4]  The burden of demonstrating

---

**3.** The fact that the aunt *also* could have withdrawn the funds at any time did not negate the immediate benefit she conferred upon her niece by making her a co-owner of the account.

**4.** We note that our analysis of the evidentiary effect of the stipulation to a confidential relationship comports with Md. Rule 5-301, entitled "Presumptions in civil actions," which provides at subsection (a):

undue influence remained on appellants as the parties seeking to void the transaction; and the proper standard of proof was "by a preponderance of the evidence." *Krouse v. Krouse,* 94 Md.App. 369, 378, 617 A.2d 1098 (1993). In considering the evidence before it, therefore, the trial court erred in assigning the burden of persuasion to the Clarkes and in requiring them to prove the absence of overweening influence by the higher "clear and convincing" standard of proof.

## II.

Even though the trial court erred in placing the evidentiary burden on the Clarkes, that error does not warrant reversal of its judgment. As noted above, the burden of proof should have been on appellants to show by a preponderance of the evidence that the Upman Trust Amendment was the product of undue influence by the Clarkes over Genevieve. Instead, the trial court decided the matter under a clear and convincing evidence standard imposed upon the Clarkes. Under that heavy standard, the court nevertheless found that Genevieve's decision to amend the Upman Trust was "certainly not one where there [was] undue influence for the profit of the [Clarkes]...."

Ordinarily, our review of a sufficiency of the evidence challenge is relatively simple. We do not substitute our

---

Unless otherwise provided by statute or by these rules, in all civil actions a presumption imposes on the party against whom it is directed the burden of producing evidence to rebut the presumption. If that party introduces evidence tending to disprove the presumed fact, the presumption will retain the effect of creating a question to be decided by the trier of fact unless the court concludes that such evidence is legally insufficient or is so conclusive that it rebuts the presumption as a matter of law.

The confidential relationship, as stipulated, gave rise to a presumption of undue influence, which in turn cast upon the Clarkes the burden to produce evidence to rebut it. They did so. The burden of persuasion on the issue of undue influence remained with appellants; the evidence of a confidential relationship remained in the case as a factor to be considered by the trier of fact. *See Carrion v. Linzey,* 342 Md. 266, 278, 675 A.2d 527 (1996); *McQuay v. Schertle,* 126 Md.App. 556, 591–92, 730 A.2d 714 (1999).

judgment for that of the trial court; rather, giving due regard to that court's opportunity to judge the credibility of the witnesses, we simply decide whether the findings are clearly erroneous. Md. Rule 8–131(c); *Urban Site v. Levering*, 340 Md. 223, 229–30, 665 A.2d 1062 (1995); *Shallow Run Ltd. Partnership v. State Hwy. Admin.*, 113 Md.App. 156, 173, 686 A.2d 1113 (1996). We review the evidence in the light most favorable to the prevailing party, not to determine whether the trial court was correct but only to determine whether its decision was supported by sufficient facts to meet the evidentiary burden imposed. *See e.g., Urban Site, supra,* at 230, 665 A.2d 1062; *Mercedes–Benz of N. Amer., Inc. v. Garten,* 94 Md.App. 547, 556, 618 A.2d 233 (1993).

As we have indicated, in this case, the trial court applied the wrong evidentiary standard, and assigned that burden to the wrong party. Because it found an *absence* of undue influence by clear and convincing evidence, however, it logically follows that it would not have found the *presence* of undue influence by a preponderance of the evidence. Nonetheless, the proper burden and standard of proof provide the lens through which we view the evidence in assessing sufficiency.

■ A confidential relationship may not be misused, unfairly and unreasonably, to the advantage of the dominant party. A transfer of property to the dominant party must be " 'the *deliberate and voluntary act of the grantor' and must be 'fair, proper and reasonable under the circumstances* [.]' " *Sanders v. Sanders,* 261 Md. 268, 276–77, 274 A.2d 383 (1971)(internal citations, quotations omitted; emphasis supplied).

Appellants argue that the trial court reasonably could not have found that the amendment to the Upman Trust naming the Clarkes as sole beneficiaries was fair, proper, and reasonable because: (1) by the time Genevieve executed the Trust Amendment, her mental capacity[5] had deteriorated to the

---

5. In this appeal, appellants do not attack Genevieve's testamentary capacity directly, as they did at trial. Rather, as noted above, they

point that she was incapable of making an independent decision without relying on the Clarkes; and (2) Genevieve's decision to make the Clarkes the sole beneficiaries of her entire estate through the Trust Amendment was such a "vast change" from her previous wills that it must have been the result of undue influence by the Clarkes for self gain.

■ With respect to appellants' first argument, the record reveals that although Genevieve was dependent upon the Clarkes, especially Patricia, for her day to day needs, there was ample evidence that she was mentally alert and capable of understanding the effect of amending the Upman Trust. The Trust Amendment itself was one typed page and was not difficult to understand. Patricia testified that Genevieve read the Upman Trust Amendment and the 1995 will after she received them from her attorney, and that she kept them with her.

Jennifer Wright testified as follows about the voluntariness of Genevieve's act:

Q: All right. Can you explain it to the jury what you remember about [Genevieve coming to your office]?

A: Pat and Ken Clarke brought Mrs. Upman into the bank. She was a short white-haired lady. She had a walker. She walked back into my office and, of course, she had a seat and she signed the paper. She showed me her medi—medicaid or medicare [card] for identification and I notarized the paper and they left.

Q: Now when she signed it, did she appear to be mentally sound—mentally sound?

A: Yes, she did, very much so.

Q: Why do you say, "Very much so?"

A: Well, she got her card out without me even asking for it and—and I didn't think most people that age would probable even think you'd need ID.

---

simply maintain that her deteriorated mental state made her more susceptible to undue influence by the Clarkes.

Q: All right. And now, did she act freely in executing that, or was there any indication she might be forced or coerced in this?

A: No, there was no indication of that. She signed it very freely.

Appellants offered no evidence to rebut Ms. Wright's assertion that Genevieve appeared to be acting voluntarily and in the absence of duress when she executed the Upman Trust Amendment. They argue that the trial court should have discounted that testimony, however, because although Ms. Wright stated that she saw Genevieve read the Trust Amendment, she did not speak with Genevieve very long or quiz her about the contents of the document she was signing. Given that it was within the province of the trial court as the trier of fact to assess the demeanor of the witness and judge her credibility, we cannot say that the court erred in placing weight on Ms. Wright's testimony and concluding from it that Genevieve acted voluntarily in signing the Trust Amendment.

Although Dr. Seals testified that he diagnosed Genevieve with dementia, and that she probably would have had difficulty maintaining her business affairs, he conceded that she knew her relatives, knew that she owned a home, had strong opinions about not wanting to enter a nursing home, always knew him when she came in for treatment or a checkup, and was a pleasant conversationalist.

Christine testified that Genevieve became increasingly forgetful over time; that before Genevieve moved in with the Clarkes, she imagined that a neighbor was shining a light into her house; that she became confused about where she was living after she moved in with the Clarkes; and that by the time she executed the Upman Trust Amendment, she had forgotten what assets she owned. Other witnesses testified, to the contrary, that Genevieve was of sound mind when she amended the Trust. When Lawrence Muller was asked whether Genevieve appeared to be of sound mind when he witnessed her sign her will, in August of 1995, he replied, "positively, yes ... probably as well as I was at that time."

Kim Mullins explained her belief that Genevieve was of sound mind when she executed that will as follows: "[W]e carried on a small conversation and she—she was sitting at the table with her hands crossed and then she banged the table. She goes, 'Let's get on with it,' and she just seemed like she had a good personality from what I saw. I mean, she just seemed fine." Kim added that after she affixed her signature to the will, Genevieve thanked her and her husband.

Sister Eileen Fitzgerald, from Genevieve's church, St. Alphonsus, visited Genevieve for two years before she moved in with the Clarkes, and about three times after the move. Sister Eileen gave the following account of her first visit with Genevieve after she moved to the Clarkes:

> Father and I went together to find the place ... she seemed ... contented. I felt that she was—maybe deteriorated physically, ... but ... she knew who we were. She knew we came from church ... and she expressed great happiness and gratitude for being there. You know, she praised the Clarkes for taking care of her and ... giving her a place to be, and she was in a very pleasant mood, I would say.... She kept saying that she was so grateful that she could be there and that she knew she couldn't do anything for them to show that ... that she couldn't help them. That is what she kept saying, "I can't help them. I can't do anything for them. They have to do everything for me."

Genevieve's longtime friend, Catherine Crow, spoke with her over the telephone after she moved in with the Clarkes. She remembered Genevieve being somewhat more forgetful, but testified that she was always "alert" and knew her when they talked. She testified that Genevieve "praised" the Clarkes all the time, and that "she always said how wonderful it was up there." Ms. Crow also identified a sympathy card that Genevieve had sent her when she was sick in May, 1995. Genevieve had written "My prayers are with you. I wish I had a car to come to see you. Much Love from all of us. Genevieve."

Another of Genevieve's longtime friends, Elizabeth McEnaney, described a visit she made in November or December of 1995 with her daughter and granddaughter to see Genevieve at the Clarkes' home. Although Ms. McEnaney thought Genevieve's short term memory had deteriorated, she did not think her friend was senile. She related that she introduced her two-year-old granddaughter, whom Genevieve had never met before, and that about an hour into the visit Genevieve forgot the child's name. Ms. McEnaney explained: "But you know, she knew it was [my son's] daughter, so just little—I didn't find her senile, but I think just age—you know, normal aging." Ms. McEnaney also described an earlier occasion when Genevieve was in the hospital and there was talk of her going to a nursing home: "She absolutely refused to go to a nursing home . . . and the nurses could not believe . . . she even lived by herself . . . because they thought she was just too handicapped. [She said] 'No, I am going back to my house. I'm not going to any nursing home,' and she did not go."

Patricia also testified as to Genevieve's competence and general intelligence. She noted that Genevieve liked to keep up with current affairs within the Catholic Church and that she read the Catholic Digest and Catholic Review regularly, and would set aside articles of interest that she thought others should read. Genevieve sorted her own mail, and, with Patricia's assistance, paid her bills, including utility and lawn care bills for her house. She also helped out with Kenneth's plumbing business by sorting archived records into chronological order.

From our review of the record, we conclude that there was ample evidence to support a finding that Genevieve had the mental capacity to understand the effect of the Trust Amendment and to sign it freely.

■ With respect to appellants' second contention, what they characterize as a "vast change" in intent by Genevieve to leave all of her estate to the Clarkes in fact was consistent with the intent underlying her prior wills. From her husband

Adam's death in 1967 until the late 1980's, Genevieve led an independent, self-reliant life in her Ellicott City house. When her health began to fail, Kenneth and Christine pitched in so that she could remain living on her own. Her gratitude to them was reflected in the wills that she executed over that time. In her 1987 will, she left her assets to a great number of both her and Adam's relatives. According to her friend, Catherine Crow, however, by 1991 Genevieve had become disappointed that many of her relatives "didn't come around and help her." Genevieve told Catherine Crow that she planned to change her will to benefit Christine and Kenneth "because they [were] the ones that helped her." Consistent with that intention, Genevieve executed a new will naming Christine and Kenneth as personal representatives and providing that they would share in the same category of assets as Genevieve's living brothers and sisters, with the additional benefit that if one of them predeceased her, his or her descendants would take a share.

Genevieve's 1994 will and the Upman Trust plainly evidence her gratitude to Kenneth and Christine. In her previous wills, Genevieve left all of her stocks and bonds to Adam's nephews and nieces. In the Upman Trust and the 1994 will, however, these assets (to the extent that the aggregate was more than $2,000) were bequeathed to Kenneth and Christine; the previous recipients were cut out of the will altogether. During this period of her life, it was apparent that but for help from Kenneth and Christine, Genevieve could not have remained in her Ellicott City home. She was becoming forgetful, and her polymyositis was making it difficult for her to perform many of the physical acts necessary for her to care for herself. Christine testified that she went to Genevieve's house to help her at least twice a week, and that Kenneth helped Genevieve write checks and keep her business affairs straight. Christine also testified that she became concerned about Genevieve's deteriorating physical health at this time, but that when she suggested to Genevieve the possibility of changing her living arrangements, Genevieve was "adamant about not entering a nursing home."

It was in this context, then, that Genevieve fell at home and was admitted into the hospital in March, 1995. Dr. Seals explained that he informed Genevieve's family that she would no longer be able to live alone. Patricia testified about the decision she and Kenneth made to take Genevieve into their home:

It's sort of the reflex when someone's drowning, you reach in and grab 'em first, then you decide what to do after the fact. Christine Healy wasn't gonna take her. Her advice was, she can't do anything—you know, she has to go to a nursing home or elder care or something. *Genevieve was adamant, she would not go to a nursing home.*

When I talked about it with Ken, at first, it was absolutely ... we will find a way to bring her into our home. In talking to Dr. Seals, he informed us that she would be a handful, that she required a lot of physical case, custodial care helping take care of herself and were we sure that we knew what we were getting ourselves into, and I told him, after thinking about and praying about it, "Yeah, I think that I can do this."

Obviously, Genevieve appreciated the sacrifice that the Clarkes made in taking her into their home and caring for her. The evidence established that she told several of her friends and Sister Eileen that she wanted to show her gratitude to the Clarkes. Executing a new will and amending the Upman Trust in 1995 were acts consistent with her previous pattern of changing her will to benefit those who were helping her. The Clarkes not only made sacrifices to care for Genevieve they also prevented her from having to enter a nursing home, a fate she dreaded. In addition, after Genevieve entered the Clarke household, beneficiaries of previous wills began to pay less attention to her. As we have noted, Christine only saw her aunt once or twice a month after the Clarkes began to care for her in their home. None of the other appellants in this case visited Genevieve at all in the year that she lived with the Clarkes. Indeed, most of them admitted that they had not seen her in years.

Following a trend plainly evident in her previous wills, Genevieve again changed her testamentary documents to reward those of her relations who "helped her." She did not do so to the detriment of any person who could be considered the natural object of her bounty or to the benefit of a stranger or newcomer on the scene. The evidence was more than sufficient to support the trial court's judgment that the Upman Trust Amendment was the free and voluntary act of Genevieve Upman.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**