Francine K. WEISS, et al., Plaintiffs,

v.

Linda LEHMAN, et al., Defendants.

Civ. A. No. 85–0721.

United States District Court,
District of Columbia.

May 22, 1989.

See also 610 F.Supp. 609.

Emil Hirsch, Thomas, Hirsch & Albert, Washington, D.C., for plaintiffs Francine K. Weiss and Jacob J. Katzow.

Leonard C. Collins, Washington, D.C., for Hyman Alpert, Robert Alpert and Hy–Bob Co., Inc. (Alpert defendants).

Harry C. Storm, Abrams, West & Storm, Bethesda, Md., for Linda Lehman Gibson, a/k/a Linda Lehman, Linda Lehman Gibson, Personal Representative of Estate of Morton A. Gibson, Lehman Gibson Associates, Inc., and Lehman Gibson Associates (Lehman/Gibson defendants).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SPORKIN, District Judge.

*Procedural Background*

This action was commenced by the plaintiffs Francine K. Weiss (Weiss) and Jacob Katzow (Katzow) against Linda Lehman individually and in her capacity as personal representative of the estate of Morton A. Gibson, her deceased husband, Lehman Gibson Associates, Inc., and Lehman Gib-son Associates (hereinafter sometimes collectively referred to as the Lehman defendants) and against Hyman Alpert, Robert Alpert and Hy–Bob Co., Inc. (hereinafter sometimes collectively referred to as the Alpert defendants). Nine of the fourteen counts in the complaint pertain to alleged violations of the Federal, District of Columbia and Maryland securities laws. In Counts One and Two of their complaint the plaintiffs allege that the Lehman defendants in connection with the offer and sale of joint venture interests in Baltimore real estate violated the anti-fraud provisions of Section 10(b) of the Securities and Exchange Act [15 U.S.C. § 78j] and Rule 10b–5 thereunder [17 CFR 240.10b–5] (Count One) and the registration provisions of Sections 5 and 12(1) and (2) of the Securities Act of 1933 [15 U.S.C. §§ 77e and 77*l* (1) and (2) ] (Count Two) and that the Alpert defendants aided and abetted the Lehman defendants in their alleged violations of Count One. In Count Three of their complaint, the plaintiffs allege that the Lehman and Alpert defendants directly and/or indirectly conspired to violate the federal securities laws alleged to have been violated in Counts One and Two of the complaint. In Count Twelve of the complaint the plaintiffs seek to have the court declare that certain debt securities used by them to purchase joint venture interests in two of the Baltimore Real Estate ventures be declared null and void and that they be relieved of any obligation under the debt securities in question.

In Counts Four and Five of the complaint the plaintiffs allege that the Lehman defendants violated the registration requirements [Title 2–2603] and anti-fraud prohibitions [Title 2–2613(a)(2) ] of the District of Columbia Code in that in connections with the offer and sale of the joint venture interests the Lehman defendants did not register as broker-dealers or agents with the District of Columbia Public Service Commission (Count Four) and that the Lehman defendants in connection with such offer and sale made untrue statements and omissions of material facts (Count Five). Counts Six, Seven and Fourteen involve alleged violations by the Lehman defen-

dants of the registration requirements [§§ 11–401 and 11–501] and the anti-fraud provisions [§ 11–703(a)(ii)] of the Annotated Code of Maryland, Section on Corporations and Associations in that, in connection with the offer and sale of the joint venture interests in the Baltimore properties, the Lehman defendants did not register with the State of Maryland as broker-dealers or agents (Count Six) or did not register the joint venture interests being sold with said state (Count Seven) and that in offering for sale and selling these interests in the Baltimore properties they made false and misleading statements and omissions (Count Fourteen). The Alpert defendants, while not charged in Counts Six and Seven are alleged in Count Fourteen to have aided and abetted the Lehman defendants in the violations of the anti-fraud provisions.

Count Eleven of the complaint alleges that the conduct of the Lehman and Alpert defendants in connection with the offer and sale of the interests in the Baltimore properties was in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Section 1962.

In Counts Eight and Nine the plaintiffs allege that the Lehman and Alpert defendants engaged in common law fraud (Count Eight) and breached their fiduciary obligations (Count Nine) in that in connection with the offer and sale of the aforesaid joint venture interests the defendants made false and misleading statements and omissions to the plaintiffs to whom they owed a fiduciary obligation. In Count Ten the plaintiffs alternatively allege that the Lehman defendants negligently through misrepresentations and omissions induced them to purchase the property interests in the joint ventures. In Count Thirteen, in the event the court finds they were defrauded, the plaintiffs seek to have the court declare null and void certain promissory notes and deeds of trust executed by the plaintiffs in favor of the Alpert defendants.

Defendant Lehman has counterclaimed against the plaintiffs Katzow and Weiss. In Count One of her counterclaim, defendant Lehman alleges that plaintiff Katzow intentionally engaged in a course of conduct that was calculated to remind her of her late departed husband which he knew would cause her great emotional distress. In Count Two of her counterclaim defendant Lehman alleges that the plaintiff Katzow, aided and abetted by plaintiff Weiss, under the guise of obtaining discovery in these proceedings, commenced to communicate with clients of Lehman in an effort to get these clients to cease doing business with Lehman. In Count Three of her counterclaim defendant Lehman alleges that commencing on or about March 20, 1986, Katzow aided and abetted by Weiss, in an effort to discredit Lehman, invaded her privacy by disclosing to her investors facts concerning her personal life which Katzow learned while treating her in a professional capacity.

Lehman–Gibson Associates, Inc. filed a counterclaim against the plaintiffs Weiss and Katzow containing numerous counts, all of which pertain to Lehman–Gibson Associates, Inc., seeking to have the court grant judgment against the plaintiffs on promissory notes and deeds of trust executed by the plaintiffs in connection with their purchases of properties from Lehman–Gibson Associates, Inc.

This case was heard by the court in a non-jury trial. The presentation of the evidence consumed fourteen trial days at which time thirty-one witnesses were called by the parties including plaintiffs Weiss and Katzow and defendants Linda Lehman, Hyman Alpert and Robert Alpert. Numerous documents were introduced into evidence by the parties. Post trial proposed findings of fact and conclusions of law were submitted to the court and argument was held in the matter.

The following represent my findings of fact and conclusions of law based upon the evidence adduced at trial and the legal arguments advanced by the parties.

## FINDINGS OF FACT

*The Parties In This Lawsuit*

Plaintiff Jacob J. Katzow (Katzow) was, at the time of trial, 51 years old and since

1967 has been a practicing psychiatrist. Since 1970 he has served as an Associate Clinical Professor at George Washington Medical School.

Plaintiff Francine K. Weiss (Weiss) was at the time of trial 38 years old. She is an attorney specializing in labor law and employment discrimination. Since 1982 she has been engaged in the practice of law as a sole practitioner.

Plaintiffs Katzow and Weiss are husband and wife and have been married since February 3, 1979. At all times relevant to these proceedings they have resided in the District of Columbia. They are the parents of two children who were 4 and 6 years at the time of trial.

The defendant Linda Lehman Gibson ("Lehman"), who at time of trial was 37 years old, is an adult resident of the State of Maryland. She has been sued individually and as personal representative of the estate of her deceased husband Morton A. Gibson ("Gibson"), who died on August 2, 1984. Lehman is a 1971 graduate of George Washington University with a degree in philosophy. Gibson was a graduate of the Wharton Business School of the University of Pennsylvania.

The defendant Lehman Gibson Associates ("LGA") is a partnership formed by Lehman and Gibson in 1977. LGA sold tax-sheltered investments, residential real estate, insurance, stocks, bonds, mutual funds and other investment products from an office in Silver Spring, Maryland.

The defendant Lehman Gibson Associates, Inc. ("LGA, Inc.") is a Maryland corporation established in 1977, the stock of which was owned entirely by Lehman and Gibson. LGA, Inc. is a licensed Maryland mortgage banking company.

The defendant Hyman Alpert and his son, Robert Alpert ("Alperts") are adult residents of the State of Maryland and were the sole owners of the defendant Hy-Bob, Inc. ("Hy-Bob"), and Redstart Corporation, both Maryland corporations. These defendants are sometimes collectively referred to as the Alpert defendants.

*Events Leading to the Creation of the Baltimore Joint Ventures*

Katzow first became acquainted with Lehman in 1975 when he was introduced to her at the home of one of Katzow's friends. At the time Lehman was associated with Investors Economic Systems (IES), an investment firm which was selling real estate limited partnerships. Katzow did not meet Gibson, who was also employed by IES until several years later.

Katzow purchased a $10,000 unit in a limited partnership from Lehman while she was employed by IES. Katzow ultimately lost his $10,000 investment due to the fraudulent practices of that firm and its principals. During the investigation by federal authorities into the illegal activities of IES, Lehman cooperated fully and was in fact credited with stopping the illicit activities by blowing the whistle on that concern.

Weiss was first introduced to Gibson and Lehman in 1978. Weiss and Katzow developed a personal as well as a business relationship with Lehman and Gibson. In 1978, prior to their marriage, Weiss and Katzow each purchased for investment a residential property in Montgomery County through Lehman and Gibson, who at the time were licensed real estate agents for a realtor in Montgomery County, Maryland. They later sold these properties through Lehman and Gibson at a substantial profit.

In late 1978, Lehman and Gibson became disenchanted with the Montgomery County real estate market and switched their interest to the Baltimore, Maryland, real estate market. At the time Baltimore was experiencing a development renaissance in the Baltimore Inner Harbor. Lehman and Gibson believed that greater profits could be derived from real estate ventures in the Baltimore area where properties downtown were selling from $5,000 to $10,000 a unit as opposed to the Washington, D.C., area where a shell in downtown Washington, D.C., was selling for $45,000.

Lehman and Gibson decided that they would market their purchases of real estate in Baltimore through the use of joint ventures. When they commenced opera-

tions, Lehman and Gibson did not know how many joint ventures they would create. Their purpose in creating the joint ventures to purchase the Baltimore properties was twofold, i.e. the purchasers would get certain immediate tax benefits and eventually would benefit from the appreciation of the real estate.

Sometime in August 1978, Hyman Alpert, a real estate promoter, became interested in purchasing real estate in downtown Baltimore. Hyman Alpert and his son Robert Alpert as part of their real estate operations typically would purchase in packages numerous real estate properties and thereafter (after preparing them for sale) would offer them for sale at a substantial profit.

On or about August 7, 1978, the Alperts, in the name of Hy–Bob, purchased from Philip Needle a package of 66 properties in downtown Baltimore for approximately $315,000. These 66 houses were within twenty to thirty minutes walking distance from the renowned Baltimore Inner Harbor development.

Shortly after the purchase of the 66 houses, Hyman Alpert was introduced to Lehman and Gibson by William Wadle, a Vice President for VMI Mortgage Bank of Baltimore. The Alperts offered Lehman and Gibson the properties which they had purchased.

The first sale of Baltimore properties by the Alperts to Lehman and Gibson occurred in March 1979. This involved the sale of the 66 properties which the Alperts had obtained from Philip Needle in August 1978. The Alperts received $660,000 for these properties, or approximately $10,000 per property. As a part of the transaction the Alperts arranged for non-recourse financing and assured that the properties were in compliance with Baltimore's strict housing code. The Alperts also guaranteed that each property sold would be tenant occupied.

Altogether, the Alperts purchased close to 1,000 Baltimore properties in the name of Hy–Bob or Robert Alpert. Subsequently, as will be discussed hereinafter, the Alperts sold, directly or indirectly, approximately 360 of these Baltimore properties, about 35%, to the twenty-nine Baltimore Joint Ventures organized and sponsored by Lehman and Gibson.

At the time Lehman and Gibson purchased properties from the Alperts neither of them knew what the Alperts had paid for the properties. Further, neither Lehman nor Gibson obtained any appraisals on the approximately 360 Baltimore properties which were purchased from the Alperts. Neither Lehman nor Gibson inspected these properties because after viewing 25 or 30 of them they knew what to expect, since all the houses obtained from the Alperts were similar in condition.

Lehman and Gibson determined that they would place the properties purchased from the Alperts in joint ventures which came to be known as the Baltimore Joint Ventures (hereinafter collectively referred to as the BJVs and individually as BJV I, BJV II, etc.).

The substantial majority of the Baltimore properties placed in the BJVs averaged $10,000 a property. The prices at which the properties were actually sold ranged between $5,500 per property to $13,750 a property. All the properties purchased for the BJVs were located within a 1½ mile radius.

Lehman and Gibson's primary concerns in selecting these properties for sale to the BJVs were that: 1) properties were violation free, and 2) the price was reasonable. All told, there were 29 BJVs created to hold the approximately 360 Baltimore properties obtained from the Alperts. These BJVs were sold during the period March 6, 1979, through December 28, 1981. As will be discussed later, the plaintiffs Katzow and Weiss purchased interests in BJVs I, II, IV, VI, VIII, X, XII, XVI, XXI, XXIV, XXVI and XXVIII.

In the purchases by the BJVs of the Alpert-owned Baltimore properties, Lehman and Gibson in the name of LGA received a 10% interest in each venture. For this interest LGA was to maintain records related to the venture, prepare the necessary tax forms and to hire a Baltimore

manager who would oversee the day-to-day management of the properties, as required by Baltimore City law. The function of LGA, however, was not to manage the properties on a day-to-day basis.

In addition to receiving a 10% interest from the BJVs, Lehman and Gibson received a commission from the Alperts, payable to LGA for acting as a real estate broker for the sale of the Baltimore properties owned by the Alperts which were placed in the BJVs. The commission paid by the Alperts to Lehman and Gibson depended on the structure of the sale. A greater commission was paid if the amount of cash received in the acquisition of property was substantial. Where the purchase was financed in part by a mortgage taken back by the Alperts, the commission was less.

The 66 properties initially purchased by the Alperts from Philip Needle were placed in BJVs I, II, III, and IV. Lehman and Gibson received a commission from the Alperts of $780 to $790 a property for these transactions. Thereafter the commissions paid to Lehman and Gibson were higher and they received a commission of approximately $2,000 per property for placing Alpert-owned properties in BJVs XXVI, XXVII, and XXVIII. The total commissions received by Lehman and Gibson in connection with their promotion of the 29 BJVs were substantial and exceeded $300,-000.

The Alperts made a profit of approximately $2,200 to $3,000 a house on the sale of the 80 properties to BJVs I, II, III, and IV. Thereafter they made an average $1,900 a property on the sales into the remaining twenty-five BJV programs. The Alperts made in excess of $500,000 on the sale of the properties placed in the BJVs. In addition, commencing with BJV IV, the Alpert defendants began receiving an interest in the BJVs being offered and sold. That interest was usually 10%.

*Phase I Purchases by Katzow and Weiss of Baltimore Real Estate*

In late 1978 Lehman and Gibson in discussions with Katzow and Weiss first broached the subject of investing in the Baltimore real estate market. They told Katzow and Weiss that there was more money to be made in investing in Baltimore properties than in investing in real estate located in Montgomery County, Maryland. They believed that the Washington suburbs had nearly reached their full investment potential but that the city of Baltimore was at the beginning of its renaissance.

Sometime in early 1979 Lehman and Gibson, as part of their campaign to promote the Baltimore properties, approached Katzow and Weiss regarding these properties. Even after Katzow and Weiss had made their first investment in the BJV ventures, Lehman and Gibson continued their campaign to advise Katzow and Weiss about the merits of investing in future BJVs. For example, Lehman and Gibson advised Katzow and Weiss sometime in 1980 that downtown Baltimore real estate was still a good investment.

Katzow and Weiss made their first investment in a BJV in March, 1979, and made their last investment in a BJV in mid-October, 1981. All told, Katzow and Weiss invested $162,333.72 in 12 BJV programs. *See* Appendix A. The plaintiffs acquired a 10% ownership interest in BJVs I, II, VI, VIII, X, XXIV and XXVIII; a 15% interest in BJVs XII and XXVI; a 20% interest in BJV IV, and an 80% interest in BJVs XVI and XXI. The reason the plaintiffs purchased 80% interests in BJVs XVI and XXI was because they wanted eventually to own their own venture. BJV XVI consisted of 5 properties and BJV XXI consisted of 7 properties.

The plaintiffs' objectives in investing in these BJVs was two-fold. First, they were principally interested in obtaining tax benefits since Katzow was a practicing psychiatrist who was beginning to earn substantial monies from his practice. In addition Weiss, his wife, was also starting to earn money from her legal practice. They also hoped that the properties would appreciate, particularly if the Inner Harbor Development extended to the area where their properties were located. Katzow recognized the risks inherent in this second aspect of his investment objective.

As stated earlier, the average cost of the properties placed in the BJV ventures in which Katzow and Weiss invested was approximately $10,000 per property. Katzow testified that he believed that this price was reasonable, and his counsel conceded there would be no case if the investment program was concluded after these initial purchases.

The purchase price paid for interests in the various BJVs differed, depending on the number of and the quality of the properties placed in each BJV. For example, 20 properties were placed in BJVs I and II, and 15 in BJV IV as opposed to only 5 properties placed in BJV XVI. The number of cash investors in the 12 BJVs ranged from 1 (the plaintiffs Katzow and Weiss) in BJV XVI and XXI to 10 in BJV I. As was stated earlier, Lehman and Gibson in the name of LGA received a 10% interest in each of the twelve BJVs in which Katzow and Weiss participated; and the Alpert defendants, after BJV IV in which they received a 5% interest, received a 10% interest in the nine BJVs formed subsequent to BJV IV in which the plaintiffs participated. Plaintiffs Katzow and Weiss were fully aware of this arrangement when they made their investments.

Lehman and Gibson received commissions from the Alperts in connection with the sale of the Alpert-owned properties to the various BJVs. The settlement sheets sent to Katzow and Weiss did not disclose this fact.

The plaintiffs at all times made their investments in the BJV ventures with a minimum down payment. The balance of the purchase price was provided by purchase money mortgages from the Alperts or through mortgage financing arranged by LGA, Inc.

Prior to their investing in their first BJV, Katzow and Weiss were told by Lehman and Gibson that the properties to be placed in the BJVs were being purchased from the Alperts. While Lehman advised the plaintiffs that she did not know how much the Alperts had paid for the properties, Katzow understood that the Alperts were making a profit on the sales of the Baltimore proper-

ties. In the Spring of 1979 after the first purchase of a limited partnership interest in a BJV, Katzow along with other persons took a trip to Baltimore, Maryland, to view the BJV properties. Katzow saw what the Baltimore properties looked like and that they were not "next door" to the Baltimore Inner Harbor.

Katzow and Weiss had the documentation in connection with their investments in the BJVs reviewed by their own attorney who found it satisfactory. The documentation disclosed the identity of the other partners and their interests. Even though the plaintiffs knew who the other investors were, they made no effort to communicate with them prior to the commencement of this litigation.

*Phase II Purchases by Katzow and Weiss of Baltimore Real Estate*

Commencing around February, 1982, less than two months after the last BJV had been formed (BJV XXIX), Lehman and Gibson put into operation a plan to close out the BJVs by offering for sale the individual properties owned by the BJVs, principally to the original BJV investors. Pursuant to this plan, the BJV partners were individually offered the properties owned by the BJVs. Lehman and Gibson advised the joint venturers to effect the purchase of properties in the name of an entity rather than effecting these purchases in their individual capacities. While it was never explained why Lehman made this recommendation, I would assume that this related to certain tax aspects of the transaction.

During the period from February, 1982, through October, 1983, prior to the time plaintiffs commenced purchasing BJV properties for themselves under the name of A & M, they agreed to sell Baltimore properties owned by the BJVs in which they were partners. They specifically authorized Lehman Gibson to offer for sale their BJV properties.

Pursuant to this arrangement, Lehman and Gibson during the period March, 1982, through some time in December of 1984 were successful in finding purchasers for certain of the Baltimore properties owned by the BJVs. Most of the purchasers of

these properties were themselves holders of partnership interests in BJVs.

The prices at which these properties were resold were arbitrarily determined by Lehman and Gibson. No appraisals were obtained on these properties either by Lehman, Gibson or LGA or by the purchasers of the properties. In effect the purchasers followed the instructions of Lehman and Gibson in making their purchases. Approximately two-thirds (⅔) of the properties purchased from the BJVs in Phase II were purchased by persons who had purchased partnership interests in the BJVs.

During the period February, 1982, through sometime in the summer of 1983, Katzow and Weiss received settlement sheets relating to the sale of properties out of the BJV ventures in which they were participants. The prices at which these properties were sold were in the $20,000 to $25,000 price range. Lehman/Gibson would remit the proceeds from these sales to the limited partners less their commissions. Katzow testified that there was no understanding that these proceeds were to be used to buy BJV owned properties. He testified that he could use these proceeds in any manner that he wished.

Commencing on October 15, 1983, Katzow and Weiss commenced their individual purchases of BJV real estate properties in the name of A & M Enterprises (A & M), a Maryland general partnership formed by Katzow and Weiss. A & M are the first initials of the issue born to Katzow and Weiss. During the period October 15, 1983, through December 28, 1984, Katzow and Weiss in the name of A & M purchased twenty-five (25) properties from the various BJVs. Eleven (11) of these properties were purchased in 1983 and fourteen (14) were purchased in 1984. The closing on 13 of the 14 transactions in 1984 occurred after Gibson's death on August 2, 1984.

The prices paid for the 25 properties acquired in the name of A & M ranged from $20,000 to $32,500 per property. *See* Appendix B. Seventeen (17) of these 25 properties were purchased from BJVs in which Katzow and Weiss held a partnership interest. *See* Appendix C.

The investment goals of Katzow and Weiss for investing in Phase II did not change. The purchases of the 25 properties through A & M were made principally for tax reasons and secondarily for appreciation. The plaintiffs Katzow and Weiss were now embarked on a program to lower their taxes by stepping up their purchase price basis in the Baltimore properties and taking depreciation against the new arbitrary higher sales price.

The purchases of the 25 properties in the name of A & M were financed in part through the monies which Katzow and Weiss realized from the sale of properties out of the BJVs in which they held partnership interests. Included in that money was a profit of $27,462.63. As stated earlier, Katzow and Weiss invested $162,333.72 in the 12 BJVs in which they purchased partnership interests. They received $189,-796.35 from LGA as their share of the proceeds from the sales of properties from those BJVs in which they held partnerships. They had been paid $93,464.52 by October 15, 1983, the date of their acquiring their first properties in the name of A & M. In addition they received another $86,370.52 in proceeds during the period after October 15th until March 1, 1985, when they commenced this action. They received an additional $9,961.31 after March 1st, 1985. The difference between the amount they initially invested ($162,-333.72) and the amount they ultimately received from the sale of the BJVs ($189,-796.35) netted them a profit of $27,462.63. This was in addition to the $57,506 in tax benefits gained by the plaintiffs on these transactions during the period 1979 through 1982. Further, they now had a higher tax base since the prices they paid for the properties carried a value two to two and a half (2 to 2½) times higher than their original purchase costs.

In making these purchases of BJV properties in the name of A & M, Katzow and Weiss did not seek independent verification of the value of these properties. Katzow and Weiss financed the purchases of these 25 properties by obtaining loans from LGA, Inc., for the difference between their mini-

mum cash down payment and the purchase price. LGA, Inc., obtained the money loaned to Weiss and Katzow to finance their A & M purchases by selling notes to investors, many of whom were themselves limited partners in the BJVs, and some of whom purchased BJV properties.[1] In addition to the financing arranged by LGA, Inc., Katzow and Weiss obtained partial financing toward the purchase of two (2) of the Phase II Baltimore properties from Hy–Bob Co., Inc., an Alpert controlled company (See Appendix B). By financing these purchases through LGA, Inc., Katzow and Weiss avoided credit checks, did not have to fill out any loan applications or obtain an appraisal of the properties, which they would have had to do had they sought financing through a traditional banking institution.

In those instances where they purchased properties owned by their own BJVs, Katzow and Weiss knew what the BJV initially had paid for the property, how long it owned the property, that LGA and the Alperts would benefit from the sales of these properties since they each held a 10% interest in the ventures, and that the properties were being sold at prices 2 to 2½ times higher than the BJV had paid for them.

*The Equity Buy–Out in BJVs XVI and XXI*

As was stated earlier, Katzow and Weiss held an 80% partnership interest in BJVs XVI and XXI. The remaining 20% was held by LGA (10%) and the Alperts (10%). There were five (5) properties in BJV XVI and seven (7) properties in BJV XXI.

In March, 1983, Katzow and Weiss decided to take over the entire equity interests in BJVs XVI and XXI. They advised Lehman, Gibson, and the Alperts that they desired to buy out their minority interests. It was agreed that the price of the buy-out would be based on assigning a $24,500 value with respect to each of the 12 individual properties that comprised the two BJVs. The five (5) properties acquired by BJV XVI in June, 1980, originally were placed in

that BJV at prices ranging between $7,500 to $10,000. The seven (7) properties acquired by BJV XXI in October, 1980, originally were placed in that BJV at prices ranging between $8,000 to $10,500.

In May of 1983, the Buy–Out was completed. The Alperts were represented in this transaction by Lehman and Gibson. Pursuant to the agreement entered into by the parties, Katzow and Weiss agreed to pay $42,000 to Lehman Gibson and the Alperts to obtain the remaining 20% interest. Katzow and Weiss were committed to put $21,000 down initially and the rest was to be paid off by January 7, 1984, pursuant to an agreed upon payment schedule. None of the plaintiffs sought an independent appraisal as to the worth of these properties. In addition the plaintiffs agreed to assume the remaining mortgage indebtedness on the properties owned by BJVs XVI and XXI and to indemnify Lehman Gibson and the Alperts from any liability on the existing recourse mortgages held by LGA, Inc. In October, 1983, two $5,000 mortgages were obtained through LGA, Inc., by these BJVs.

*The Bubble Bursts*

Katzow testified that sometime in January, 1985, he asked Lehman to sell the twelve (12) Baltimore real estate properties owned in the name of BJVs XVI and XXI. It is interesting to note that Katzow's decision to sell these 12 properties occurred immediately after he had purchased seven (7) properties in the name of A & M in December, 1984. When asked about this at trial, Katzow testified that the December, 1984 purchases were in part made for tax purposes.

Lehman advised Katzow that she would not be able to sell his houses until she finished selling the properties remaining to be sold out of the original BJVs. She told Katzow that she would sell his houses as soon as she had sold the remaining BJV properties. She suggested to Katzow that if he did not want to wait, she would refer him to some Baltimore real estate brokers.

---

1. Katzow and Weiss were offered the opportunity to purchase third party mortgage notes from LGA, Inc., and declined this opportunity.

Katzow ultimately went to see Gerald Lilienfield (Lilienfield) a real estate broker with familiarity with the Baltimore, Maryland, real estate market. Lilienfield told Katzow that his Baltimore houses were not worth $24,000 and that it would not be possible to sell his properties for anything near that price.

After learning that the value of their Baltimore properties were worth substantially less than what they had paid for them, Katzow and Weiss on March 1, 1985, commenced this action. On August 12, 1985, the plaintiffs Katzow and Weiss sought the protection of Chapter XI of the Bankruptcy Laws for BJVs XVI and XXI (Bankruptcy Actions 85–00483, 85–00484). On December 5, 1985, they sought the protection of Chapter XI of the Bankruptcy Act for A & M Enterprises (Bankruptcy Action 85–00719)

CONCLUSIONS OF LAW

The court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1332 in that the matter involves citizens of different states and damages in excess of $10,000. Further the court has jurisdiction over this matter pursuant to Section 22 of the Securities Act of 1933 (hereinafter referred to as the Securities Act) [15 U.S.C. 77v] and Section 27 of the Securities Exchange Act of 1934 (hereinafter referred to as the Exchange Act) [15 U.S.C. 78aa]. The court also has jurisdiction over the State claims contained in Counts IV, V, VI, VII, and XIV pursuant to the Doctrine of Pendant Jurisdiction.

Venue is proper in this District since certain of the unlawful activities occurred or had effect within the District of Columbia.

*The Securities Act Aspects of This Litigation*

The plaintiffs Katzow and Weiss contend that the offer and sale of partnership interests in the BJV ventures and their subsequent purchase of properties from certain of the BJV ventures involved the offer, sale and/or purchase of securities, and that these transactions are regulated by the securities laws. More precisely, the plaintiffs contend that, in connection with the aforesaid transactions, the Lehman defendants and the Alpert defendants, directly or indirectly, violated the anti-fraud and registration provisions of Sections 5 and 12(1) and (2) of the Securities Act [15 U.S. C. §§ 77e and 77*l* (1) and (2) ] and the anti-fraud provisions of Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b–5 promulgated thereunder [17 C.F.R. 240.10b–5]. Plaintiffs request that, since these transactions were effected in violation of the securities laws, the court declare the debt securities executed by them in connection with these transactions be null and void in accordance with the provisions of Section 29(b) of the Exchange Act [15 U.S.C. § 78cc].

In evaluating the plaintiffs' contentions, the court must first start with the offer and sale of partnership interests in the BJVs. The court concludes that the sale of the partnership interests in the BJVs did not involve the fraudulent sale of a security. What is more, plaintiffs are unable to demonstrate they incurred an economic loss as a result of such transactions.

The evidence in this case shows that the plaintiffs, Katzow and Weiss, invested $162,333.72 in twelve (12) BJV ventures during the period March, 1979 through October 5, 1981 (See Appendix A). The cancelled checks in evidence demonstrate that during the period April 1, 1982, through March 1, 1985, the date this suit was filed, the plaintiffs received $179,835.04 from the sales of properties out of the BJV ventures in which they had invested. The evidence further demonstrates that subsequent to March 1, 1985, plaintiffs received an additional $9.961.31 from additional sales of properties out of their BJV ventures. This latter amount appears to have been placed in an escrow account maintained by the plaintiffs. The plaintiffs, as stated earlier, made a profit on these transactions of $27,462.63. In addition, the evidence demonstrates that the plaintiffs, Katzow and Weiss, for the taxable years 1979 through 1982 obtained tax benefits of $57,506.00. It is clear to this court that on their invest-

ments in the BJV ventures, the plaintiffs made a significant profit. Indeed, plaintiffs both testified they were satisfied with the profits they made. Furthermore, counsel for the plaintiffs conceded during the course of these proceedings that if the Phase I purchases of partnership interests in the BJV ventures were the only transactions involved, the plaintiffs would not have brought this suit.

I do not find that the Phase I transactions were actionable under the Federal Securities Laws. First, whether the interests sold were securities is debatable, since plaintiffs' purchases gave them the rights of a general partner. Second, even if the interests were securities, defendants would in all likelihood be able to claim the private offering exemption under Section 4 of the Securities Act of 1933 [15 U.S.C. § 77d]. Third, plaintiffs cannot show they were in any way financially injured or defrauded. Finally, these actions would be time barred under the explicit private right of action provisions of the Federal Securities Laws.

■ I find that the Phase II purchases by plaintiffs of 25 Baltimore properties and the buy-out of the remaining 20% minority interests in BJV ventures XVI and XXI were real estate transactions and did not involve the purchase or sale of securities. Unlike the Phase I transactions, the Securities Law question is not even close with respect to Phase II. Plaintiffs incorrectly allege that their Phase II purchases involved the purchase of a security in the form of an investment contract. The Supreme Court has held that an investment contract is a " ... contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of a promoter or third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical asset employed in the enterprise." *Securities and Exchange Commission v. Howey Co.*, 328 U.S. 293, 298–299, 66 S.Ct. 1100, 1102–1103, 90 L.Ed. 1244 (1946); see also *Rivanna Trawlers Unlimited v. Thompson Trawlers, Inc.*, 840 F.2d 236, 240 (4th Cir.1988).

In short, does the purchaser expect profits principally from the efforts of others. *Securities and Exchange Commission v. Howey, supra,* 328 U.S. at 301, 66 S.Ct. at 1104. *See also United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975) *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 689, 105 S.Ct. 2297, 2303, 85 L.Ed.2d 692 (1985).

The purchase of the 25 Baltimore properties by A & M during the period October, 1983, through December 28, 1984, and the March, 1983, purchase of the 20% outstanding minority interests of Lehman Gibson, Inc. and the Alperts in BJV ventures XVI and XXI were, in fact, real estate transactions and in no way involve the purchase or sale of a security. Plaintiffs Weiss and Katzow were not looking to the Lehman defendants for the profits to be generated from these investments and thus cannot be described as an investment contract transaction. Indeed, they purchased the properties outright without any subsequent services to be performed by any of the defendants.

After the buy-out in March, 1983, the plaintiffs Katzow and Weiss held 100% of the BJV ventures XVI and XXI, and therefore were the sole owners of the 12 properties held in these two ventures. In connection with the buy-out, the plaintiffs assumed the management of these two BJVs. Plaintiff Katzow conceded that he was not required to sign a management contract with Lehman Gibson Associates and that no such contract was offered to him. After the buy-out, plaintiffs thereafter paid the mortgages, ground rent and the taxes for the properties owned by these two BJVs. Further, the accountant for the plaintiffs prepared the tax forms. Indeed, Katzow conceded that after the buy-out he operated these ventures as a business and that he and his wife were responsible for the decision to put these two BJVs into bankruptcy.

With respect to the purchase of the 25 Baltimore properties by the A & M partnership, the plaintiffs maintained the right to select their own management company to

manage these properties. Again as in the buy-out of BJVs XVI and XXI, the selection of a management company directly or indirectly controlled by the Lehman defendants, was not a condition of the transaction. Indeed, plaintiffs subsequently selected their own management company. Further, plaintiffs themselves performed all the functions necessary to manage the BJVs. They paid the mortgages, ground rents and taxes. Again, the decision to put A & M into bankruptcy was made by the plaintiffs.

The plaintiffs had at least three motives for acquiring real estate properties in the Baltimore area in Phase II, none of which depended upon the efforts of the Lehman defendants. First, the plaintiffs were interested in continuing to obtain the tax benefits associated with the Phase I purchase of real estate properties in the Baltimore area. The inflated purchase price paid for the properties purchased in Phase II would increase their tax base for purposes of depreciation. A second motive was the expected appreciation from the development of the Baltimore Inner Harbor project. Finally, plaintiffs also realized that by paying more money for the 20% minority interests in BJVs XVI and XXI they would enhance the value of their 80% remaining interest for financial statement purposes. This they believed would be helpful in borrowing funds from the bank which they contemplated doing in connection with the purchase of a new personal residence. Again, none of these expectations relied solely or in any great part upon the efforts of the Lehman defendants.

*Common Law Claims*

I find that plaintiffs have made out actionable claims under the common law with respect to their Phase II transactions. The greed and tax avoidance motives exhibited by the plaintiffs did not in themselves give the Lehman and Alpert defendants the right to defraud the plaintiffs.

In determining these issues of Common Law Fraud, Breach of Fiduciary Duty, and Negligent Misrepresentations, the court is going to apply Maryland law since the 37 properties involved are all located in Baltimore, Maryland, and it is conceded by plaintiffs that there is *no difference* between Maryland and District of Columbia law on any of the common law issues.

It is clear from the evidence that the prices paid by the plaintiffs for the 37 properties they bought in Phase II were arbitrarily fixed by the Lehman defendants and bore no relationship to the fair market prices for such properties. Under Maryland law, the Lehman and Alpert defendants as general partners in the BJVs owed a fiduciary duty to the plaintiffs in those BJVs where they were joint partnership owners. The Lehman and the Alpert defendants breached that duty in that the Lehman defendants set arbitrary and inflated prices for the remaining 20% interest in the 12 houses in BJVs XVI and XXI and the 25 houses purchased by A & M. As a general partner, the Lehman defendants were obligated to deal fairly with the plaintiffs and not to set arbitrary and inflated prices on these transactions and further were obligated to disclose to the plaintiffs that these prices were arbitrarily set by them and bore no relationship to the fair market value for these properties.

The Alperts as general partners in BJVs XVI and XXI and in certain of the other BJVs where they had a 5% to 10% working interest owed a similar fiduciary obligation to the plaintiffs. From their own sales of similar houses, the Alperts were fully aware at the time the plaintiffs were effecting their purchases of BJV properties that the prices they paid bore no relationship to the fair market value of those properties. As general partners they breached their fiduciary duty of fair dealing to the plaintiffs.

The Alpert defendants reaped unjust profits with respect to the sale of their interests in BJVs XVI and XXI and in the other BJVs in which they had an interest that sold properties to the plaintiffs. The Lehman defendants similarly obtained unjust profits with respect to BJVs XVI and XXI and sales to the plaintiff from other BJVs in which they held an interest.

■ The test under Maryland and District of Columbia law for plaintiffs to recover is in five parts. *Finch v. Hughes Aircraft Co.*, 57 Md.App. 190, 469 A.2d 867, 888 (1984). *Nader v. Allegheny Airlines, Inc.*, 626 F.2d 1031 (D.C.Cir.1980). See also *Fowler v. Benton*, 229 Md. 571, 578, 185 A.2d 344 (1962) *cert. denied*, 375 U.S. 845, 84 S.Ct. 98, 11 L.Ed.2d 72 (1963). The test consists of: (1) the actual making of a misrepresentation of a material fact which was false or the duty to disclose, or refraining from making disclosure when required to speak; (2) the falsity was known to the defendant; (3) the false statement was made for the purpose of defrauding the purchaser; (4) the purchaser not only relied on the false statement but had the right to do so and (5) the purchaser suffered damages from the false statement.

The prices set for the Phase II transactions were arbitrary and inflated and bore no relationship to the market price for the 37 properties. Indeed, I find the BJV properties were sold to plaintiffs at prices between 2 and 2½ times their fair market value. This was a material fact which should have been disclosed to the plaintiffs but was not. Defendants conducted themselves with the intent to deceive the plaintiffs, since the plaintiffs had every right to believe that the prices they were paying for the property were at fair market value. While plaintiffs were greatly interested in the tax aspects of the transactions, they also expected to reap profits from an appreciation of the value of the properties. They clearly relied on the fact that the prices that they were paying for the properties represented fair market value. Thus, plaintiffs incurred damage as a result of defendants' actions.

The Alpert and Lehman defendants, as general partners, breached their fiduciary obligation to plaintiffs by failing to disclose to them that the prices plaintiffs were paying for defendants' interests in the BJVs

were not in any way related to the market price existing at the time. Their fiduciary relationship to plaintiffs, along with their superior knowledge of the Baltimore real estate market, required them to disclose the true facts to plaintiffs before they sold their interests to plaintiffs.

*RICO Claim*

In Count XI of their complaint, plaintiffs allege that the conduct of the Lehman and Alpert defendants in connection with the Phase I offer and sale of partnership interests in the BJVs violated the provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO) [18 U.S.C. § 1962]. Since plaintiffs through their counsel concede that defendants' Phase I conduct would of itself not be actionable, I find there is no basis for plaintiffs' claims under RICO. I am likewise dismissing all the remaining claims made by plaintiffs.

*Counterclaims of Linda Lehman*

Linda Lehman counterclaimed against the plaintiffs for 1) Intentional Infliction of Emotional Distress (Katzow); 2) Interference with Prospective Economic Advantage (Katzow)[2]; and 3) Invasion of Privacy Through Disclosure of Private Facts (Katzow).[3] For the reasons set forth below, the Court does not find any merit to these counterclaims, and accordingly they shall be dismissed as to the plaintiffs Katzow and Weiss.

*Intentional Infliction of Emotional Distress—Contention I*

■ In Counterclaim I, defendant Lehman alleges that plaintiff Katzow tormented her by wearing her late departed husband Gibson's clothes in her presence, by telephoning her and describing a particular piece of Gibson's clothing which he was wearing at that time and by returning Gibson's clothing in May, 1985. Defendant Lehman has failed to meet her burden of proving by a preponderance of the evidence that plaintiff Katzow intentionally or otherwise inflicted emotional distress or harm on the defendant Lehman.

---

**2.** The Court notes that in her amended counterclaim filed on June 19, 1986, Lehman alleged that Weiss had aided and abetted Katzow in perpetrating these torts. In her proposed findings, Lehman has apparently abandoned these counterclaims against Weiss.

**3.** *Id.*

To maintain this cause of action, the defendant has the burden of proving by a preponderance of the evidence that the conduct went "beyond all possible bounds of decency and [is] regarded as atrocious and utterly intolerable in a civilized community." *Harris v. Jones*, 380 A.2d 611, 613 (Md.1977); *Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C.1980) quoting *Restatement (Second) of Torts*, Sec. 46 (1965), Comment d, Page 72.

Defendant Lehman testified at trial that she gave Katzow her late husband's clothes because Katzow had requested they be given to him at a June 30, 1984, farewell dinner for Gibson at Mama Regina's Restaurant where the plaintiffs Katzow and Weiss and the defendants Gibson and Lehman were in attendance. Gibson died in August, 1984. Lehman testified that when she gave Gibson's clothes to Katzow, she made it clear that she did not want to see or hear of the clothes again.

Lehman further testified that sometime in early 1985, after she had refused to sell properties for Katzow and Weiss, Katzow began his campaign to torment her. She testified that Katzow would call her on the telephone and describe to her over the telephone an article of Gibson's clothing which he was wearing at the time, knowing full well as a psychiatrist that this news would cause her severe emotional distress.

She further testified that after the plaintiffs had commenced this action on March 1, 1985, a meeting took place at Mama Regina's Restaurant on March 18, 1985, in an attempt to resolve the pending dispute. At this meeting Katzow is alleged to have worn a blue shirt which had belonged to Gibson and that Katzow wore this blue shirt to this meeting because he knew it would upset her. According to Lehman, the campaign to torment her concluded on May 31, 1985, when Katzow returned Gibson's clothing to her. Lehman testified that as a result of Katzow's actions she suffered severe emotional distress.

Plaintiff Katzow denied that he had made a request for Gibson's clothing at the June 30, 1984, "farewell dinner" at Mama Regina's, or at any time, for that matter. Katzow and Weiss testified that it was Lehman who offered Katzow the clothes. They testified that she attached no conditions when she made the offer. Katzow testified that during the many telephone conversations with Lehman, subsequent to Gibson's death, he never mentioned the fact that he was wearing an article of Gibson's clothing or described any article of clothing he was wearing. He also testified that he did not wear a blue shirt belonging to Gibson at the March 18, 1985, meeting at Mama Regina's which had been arranged by Lehman's lawyer in an attempt to resolve the pending legal action. Further, Katzow testified that there was no blue shirt in the clothing which Lehman had given him. Katzow acknowledged that he returned Gibson's clothes to Lehman on May 31, 1985.

Essentially this cause of action rests almost exclusively upon the conflicting testimony of the plaintiffs and of the defendant. I credit the testimony of plaintiffs Katzow and Weiss on this issue and do not credit the testimony of defendant Lehman. Accordingly I find that defendant Lehman has failed to satisfy her burden of proof on this issue.

*Intentional Interference with Prospective Economic Advantage—Contention II*

■ As to Counterclaim II, the court finds that defendant Lehman has not sustained her burden of proving by a preponderance of the evidence, that plaintiff Katzow, aided and abetted by Weiss, engaged in a course of conduct designed to interfere with Lehman's prospective economic advantage and thereby caused her monetary damage.[4]

In order to prevail in this counterclaim, defendant Lehman, by a preponderance of the evidence, must prove: 1) intentional and willful acts; 2) calculated to cause

---

**4.** The court notes that in Counterclaim II, defendant Lehman included her business venture in promoting the Bella Andrea beauty salon, as having been affected by Katzow and Weiss' conduct. Defendant Lehman presented no evidence on this issue at trial and therefore the court considers that part of her claim as having been abandoned.

damage to [Lehman] in [her] lawful business; 3) done with the unlawful purpose to cause such damage or loss, without right or justifiable cause on the part of [Katzow], (which constitutes malice); and 4) actual damage and loss resulting. *Natural Design, Inc. v. Rouse Co.*, 302 Md. 47, 485 A.2d 663, 675 (1984). See also Restatement (Second) of Torts, Secs. 766B and 767.

In support of this counterclaim, Lehman testified that commencing in March, 1986, plaintiff Katzow began contacting her real estate clients under the guise of obtaining information for trial. She further testified that Katzow, in an effort to destroy her business, told these investors facts about Lehman, *e.g.* properties were worth less than one-half of what they paid; Alperts had engaged in "flipping" properties. She testified that as a result of these contacts by Katzow, her former clients discontinued dealing with her.

Katzow testified that in calling these large investors in BJV programs he was seeking information for his suit. Indeed, Gustav Zoref, Linda Kelly, Forrest Rose, and Louis Leporrati, whose testimony I credit, sought outside legal counsel and/or appraisers after their calls with Katzow. Their decision not to do further business with Lehman was made independent of any information they received from Katzow. Gustav Zoref testified that he hired his own appraiser who told him the properties he had purchased were not worth what he paid for them. He then went to look at one of the houses he had purchased from Lehman which he characterized as a "dump."

I find that Katzow's communications with investors in the BJVs were done in an effort to obtain evidence to be used at trial and were not done with malice. It is a fact of life that in a lawsuit such as this a plaintiff will seek to communicate with others who are similarly situated in an effort to obtain testimony for possible use at trial.

As I have concluded earlier, Lehman perpetrated a fraud on the plaintiffs in connection with sales to them of properties in Phase II. She grossly overvalued the properties without any basis. These investors contacted by Katzow were also victims

in Phase II purchases of properties at inflated values.

Even if Katzow's conduct was intentional, which I do not find, the statement by Katzow that properties purchased in Phase II were grossly overvalued was a true statement and is not actionable. As the *Restatement of Torts* states:

"One who intentionally causes a third person not to perform a contract or not to enter into a prospective contractual relation with another does not interfere improperly with the other's contractual relation, by giving the third person (a) truthful information." *Restatement (Second) of Torts*, Sec. 772, Page 50.

This counterclaim also fails because one of the factors in this tort is that the wrongdoer has interfered with the injured parties' right to conduct a *lawful* business. As I found earlier, defendant Lehman in the sale of real estate properties in Phase II was engaged in an *unlawful* course of conduct by grossly overvaluing the properties. No court can condone the continuation of this type of conduct.

*Invasion of Privacy—Public Disclosure of Private Facts—Counterclaim III*

■ Defendant Lehman in this counterclaim contends that during the period January through August, 1982, Lehman consulted professionally with Katzow in order that he might refer her to a mental health professional to help her cope with the personal trauma that she was experiencing in her life at the time. She further contends that at that time she disclosed to him private facts about her personal life. Lehman contends that plaintiff Katzow, commencing on or about March 20, 1986, began contacting Lehman's clients and disclosing these private facts to them. She states that these disclosures have resulted in professional and emotional injury to her. The plaintiffs Weiss and Katzow dispute her contentions.

The court credits plaintiff Katzow's testimony and does not credit defendant Lehman's testimony on the issue of whether or not Lehman ever had a doctor/patient relationship with Doctor Katzow. The evidence adduced at trial demonstrates only

that the plaintiffs had both a personal as well as a business relationship with the defendants Lehman and Gibson from sometime in 1978 through the breakup which occurred in 1985. They were involved socially and on many occasions they would get together and discuss books they had read. I do not find that Lehman ever had a doctor/patient relationship with Katzow. Indeed, when Lehman needed medical assistance for her mental health problems, Katzow referred her to a Doctor Edward O'Haneson.

The issue for the court to determine is whether or not the facts related by Lehman to plaintiffs during the period of their social and business relationship, which commenced in or about 1978, were divulged in a confidential manner and whether or not these were in fact private intimate details which, if published, would cause her emotional injury.

A confidential relationship under Maryland Law or District of Columbia Law exists through a relationship created whenever information of a private nature is divulged with the expectation that the party receiving the information will not divulge it publicly. *Finch v. Hughes Aircraft*, 57 Md.App. 190, 469 A.2d 867, 889 (1984); *Midler v. Shapiro*, 33 Md.App. 264, 364 A.2d 99, 103 (1976). See for D.C. law *Vassiliades v. Garfinckel's, Brooks Bros.*, 492 A.2d. 580, 591 (D.C.App.1985). Existence of a confidential relationship is a question of fact and is to be determined on a case by case basis. *Finch v. Hughes Aircraft*, supra, 469 A.2d at 889, *Midler v. Shapiro*, supra, 364 A.2d at 103.

It is clear from the record of these proceedings that defendant Lehman herself voluntarily disclosed the private facts in question to other BJV investors. For example, Lehman told Joel Chananie and Teresa Levitin, his wife, and Linda Kelly intimate facts about her childhood. Defendant Lehman admitted that she had disclosed facts about her private life to other BJV investors. Therefore, I find this counterclaim to be without merit and it is hereby dismissed.

This is a difficult case. It has been made particularly so because it has been over-tried and too much effort has been expended in obfuscating the basic issue, namely: Did the defendants defraud the plaintiffs with respect to their real estate investments in the inner city of Baltimore. What is more, plaintiffs without adequate basis have even included a cause of action under the Racketeer Influence and Corrupt Organizations Act ("RICO") 18 U.S.C. §§ 1961–1968. In essence, what is presented by this case is an investment program that went out of control. With respect to the Phase I investments it is clear that, while the defendants made a substantial profit, there was no fraud. Indeed, plaintiffs counsel conceded that point by stating that had the program ended after Phase I he would not have brought this case.

The problems arose in connection with Phase II. That is where the Lehman defendants decided to take the investors out of their Phase I investments and place them in the Phase II program. As noted above, Phase I properties had an average cost of $10,000.

The Lehman defendants, in fashioning their Phase II plan, offered the Phase I properties to the plaintiffs and the other Phase I investors at the arbitrary price of approximately $24,000 per property. This price was arrived at without benefit of any analysis or real estate appraisal. Why the plaintiffs and other investors agreed to pay this arbitrary and indeed ridiculous price is because they trusted the Lehman defendants and were blinded to a certain extent by the tax shelter aspects of the proposal. Their business judgment was further clouded by their decision to "window dress" (i.e. give a higher value to) their investment portfolio and the very liberal financing package arranged by the defendants Lehman and Gibson, which allowed the plaintiffs to participate in Phase II by investing little if any of their own funds.

While plaintiffs profess their innocence as to exactly what was taking place, it is clear that they were motivated in part by greed, and that if they had applied their common sense, they would have had to

realize the properties they were buying were grossly overvalued. I reach this conclusion on several bases. First of all, the Phase II $24,000 per house average pricing program started in February, 1982, within months of the plaintiffs' participation in October, 1981, in BJV XXVIII, the next to last Phase I venture, where the houses were purchased by that Baltimore Joint Venture at an average cost of $12,500. Secondly, at no point did plaintiffs ask for or seek an appraisal of any of the properties they were purchasing until after they had completed their Phase II purchases and had decided to terminate their investment program. The obtaining of an appraisal would have been a prudent and simple step to take and would have demonstrated that the properties were clearly being grossly overpriced.

Although it is clear that plaintiffs did not always act prudently, I am not prepared to absolve the defendants from their fraudulent conduct. The Lehman defendants knew that the prices set by them for the Phase II houses had been arbitrarily fixed and the prices at no time represented their fair market value. It is obvious that the Lehman defendants had concocted a scheme whereby they would make unconscionable profits, principally in the form of real estate commissions and in the sale of their Phase I BJV working interests, when they placed the properties in the Phase II programs. They violated the trust and confidence plaintiffs had reposed in them. Plaintiffs were all too willing to rely on defendants so long as they believed their investment objectives were being met.

While defendants, Lehman/Gibson, may have believed they had invented a new form of Ponzi scheme, they had to realize their scheme would catch up with them unless the Baltimore City real estate market increased substantially. When that market did not increase, it became clear there would have to be a day of reckoning. Even though plaintiffs were not as prudent as they should have been, defendants cannot be allowed to profit from their fraudulent activities. At no point did defendants disclose to plaintiffs that the purchase prices of the Phase II properties had been arbitrarily fixed at prices at least two times their current market value. The Lehman defendants clearly deceived the plaintiffs and must be ordered to pay damages.

The conduct of the Alpert defendants is no less actionable. Their culpability stems from a violation of their fiduciary duty to plaintiffs in the sale of properties to plaintiffs out of the BJVs in which they had an interest. For example, on March 3, 1983, plaintiffs signed an agreement to purchase the Alperts' 10% interest in BJV's XVI and XXI based upon a $24,000 per house purchase price which was supposed to represent the fair market value of those houses at the time the transaction was consummated on May 1, 1983. The Alperts are highly sophisticated entrepreneurs with a great deal of experience in the Baltimore real estate market. When this deal occurred they knew full well that the transaction was supposed to reflect the fair market value of the BJV properties when in fact the price had been grossly inflated. Having this knowledge they nevertheless remained silent and received the benefits of a grossly inflated price. Alperts must similarly be held accountable for sales of properties to plaintiffs out of BJVs in which the Alperts had been given a 5% to 10% partnership interest. As members of the joint ventures, the Alperts owed certain obligations to their coventurers. Their superior knowledge of the real estate market required them to speak out and inform plaintiffs that they were being overcharged in connection with their purchases. This they did not do, and accordingly they must be held responsible for their conduct.

### DAMAGES

Let me now turn to the amount of damages to be assessed against defendants. Plaintiffs have requested damages that would make them more than whole. I am not prepared to give them all they are requesting. With respect to the Lehman defendants, I shall require that they disgorge all the commissions, fees and profits they received in connection with plaintiffs' purchase and financing of the Phase II properties and the plaintiffs' buyout of the

Lehman defendants' interests in BJVs XVI and XXI.

The Alpert defendants will be required to disgorge all profits they received with respect to their sale to the plaintiffs of their 10% interest in BJVs XVI and XXI as well as all other profits they derived from the sale of properties to the plaintiffs out of BJVs in which the Alperts had a partnership interest. The Alperts also will be required to pay to the plaintiffs all commissions, fees, or profits they received in connection with any financing they arranged for or provided to plaintiffs in connection with the Phase II purchases made by plaintiffs as well as the Alperts sale to plaintiffs of their interest in BJVs XVI and XXI.

I am not prepared to order a cancellation of the mortgage and other financing the Lehman defendants arranged for plaintiffs with bona fide third parties, but will order the Lehman defendants to disgorge all commissions, fees and profits they made in connection with the financing arrangements they made on behalf of plaintiffs' Phase II and BJV XVI and XXI purchases. I am denying the Lehman defendants any damages with respect to their counterclaims because they are totally without merit.

Because plaintiffs have filed for bankruptcy, I must take that fact into consideration in structuring my order in this case. I intend to implement my decision by appointing a special master to (1) liquidate the Baltimore properties and hold those proceeds to pay off plaintiffs' creditors; (2) determine the precise amount of and receive from the Lehman and Alpert defendants the damages that they owe plaintiffs; and finally, (3) make all distributions to plaintiffs' creditors and close out the bankruptcy proceedings.

While costs will be assessed against defendants, the parties will pay their own attorneys' fees.

I shall call a hearing in order to further explore the manner and method for final disposition of this matter and shall retain jurisdiction to order such other and further relief as may be appropriate. An appropriate order will follow.

## APPENDIX A
### Katzow/Weiss Investments in BJVs—1979–1981

| Date of Purchase | BJV Venture | % Interest | $ Amount Contributed |
|---|---|---|---|
| 3/6/79 | I | 10 | $ 10,277.78 |
| 4/11/79 | II | 10 | 10,277.78 |
| 6/13/79 | IV | 20 | 16,935.30 |
| 9/4/79 | VI | 10 | 10,693.75 |
| 10/4/79 | VIII | 10 | 10,912.50 |
| 1/1/80 | X | 10 | 10,533.00 |
| 3/5/80 | XII | 15 | 9,132.36 |
| 6/30/80 | XVI | 80 | 20,450.00 |
| 10/ /80 | XXI | 80 | 29,220.00 |
| 3/27/81 | XXIV | 10 | 11,418.75 |
| 6/12/81 | XXVI | 15 | 11,801.25 |
| 10/5/81 | XXVIII | 10 | 10,681.25 |
| Total cash invested | | | $162,333.72 |

## APPENDIX B
### Properties Bought by Plaintiffs Weiss and Katzow (A & M) in Phase II[1]

| Properties | Purchase Price | Amount of Note | Date Executed |
|---|---|---|---|
| 1539 N. Gilmore | $26,500 | $ 20,000 | Oct. 27, 1983 |
| 1541 N. Gilmore | 26,500 | 20,000 | Oct. 27, 1983 |
| 125 S. Catherine | 26,000 | 20,000 | Oct. 27, 1983 |
| 127 S. Catherine | 26,000 | 20,000 | Oct. 27, 1983 |
| 308 N. Gilmore | 28,000 | 21,000 | Oct. 15, 1983 |
| 1543 N. Gilmore | 26,000 | 19,500 | Oct. 15, 1983 |

| Properties | Purchase Price | Amount of Note | Date Executed |
|---|---|---|---|
| 2104 McCollock | $26,500 | $19,500 | Oct. 15, 1983 |
| 2011 W. Baltimore | 26,000 | 20,437.50 [2] | Oct. 27, 1983 |
| 2320 Division | 25,000 | 20,437.50 [2] | Oct. 27, 1983 |
| 1014 N. Broadway | 32,500 | 30,000 | Nov. 18, 1983 |
| 1017 N. Broadway | 32,500 | 30,000 | Nov. 8, 1983 |
| | | $240,875 | |
| 321 N. Stricker | 27,000 | 25,000 | Mar. 9, 1984 |
| 1533 Leslie | 18,000 | 15,000 | Aug. 10, 1984 |
| 1601 Ensor | 24,500 | 20,000 | Aug. 10, 1984 |
| 2251 W. Baltimore | 26,500 | 22,000 | Aug. 10, 1984 |
| 1712 Riggs Ave. | 24,500 | 21,500 | Sep. 28, 1984 |
| 1631 W. Lanvale | 27,000 | 25,000 | Sep. 28, 1984 |
| 1006 N. Mount | 27,000 | 25,000 | Sep. 28, 1984 |
| 1813 Kavanaugh | 44,000 | 40,000 | Dec. 21, 1984 |
| 1815 Kavanaugh | | | |
| 2208 Etting | 22,000 | 20,000 | Dec. 21, 1984 |
| 1929 Vine | 22,000 | 20,000 | Dec. 21, 1984 |
| 2020 Etting | 22,000 | 20,000 | Dec. 21, 1984 |
| 5 N. Vincent | 42,000 | 40,000 | Dec. 28, 1984 |
| 7 N. Vincent | | | |
| | | $293,500 | |
| Page Total | | $534,375 | |

[1] Plaintiffs' Exhibits 387 through 411

[2] A portion of each of these mortgages ($8,437.50) was obtained from Hy–Bob Co., Inc., a corporation controlled by the Alpert defendants and are presently held by Redstart Corporation, an Alpert-controlled entity.

APPENDIX C

| Weiss/Katzow BJV Venture | Property Location |
|---|---|
| BJV II | 2320 Division Street |
| BJV IV | 1533 Leslie |
| BJV VI | 2020 Etting |
| | 2208 Etting |
| | 1014 North Broadway |
| | 1017 North Broadway |
| BJV VIII | 2251 West Baltimore |
| | 125 South Catherine |
| BJV X | 127 South Catherine |
| | 2104 McColloch |
| BJV XII | 1712 Riggs Avenue |
| BJV XXIV | 308 North Gilmore |
| | 1929 Vine Street |
| | 1006 North Mount Street |
| BJV XXVI | 1601 North Ensor |
| BJV XXVIII | 5 North Vincent |
| | 7 North Vincent |

508

## ORDER

Based upon the evidence adduced at trial I have this day issued my Opinion. Based upon my Findings of Fact and Conclusions of Law I find that the plaintiffs shall be granted judgment on their Common Law claims contained in Counts VIII (Common Law Fraud) and IX (Breach of Fiduciary Duty). Therefore, it is hereby:

ORDERED that in connection with the plaintiffs Weiss' and Katzow's Phase II purchases of 25 properties in the name of A & M and the equity buyout in BJVs XVI and XXI of the 20% interests of the Lehman and Alpert defendants, (1) the Lehman defendants are required to disgorge all commissions, fees and profits they received in connection with the plaintiffs' purchase and financing of their Phase II properties, and the plaintiffs' buyout of the Lehman defendants' 10% interests in BJVs XVI and XXI and (2) the Alpert defendants are ordered to disgorge all profits they received with respect to their sale of their 10% interests in BJVs XVI and XXI and the profits obtained on the sales to A & M of properties in BJVs in which the Alperts had a partnership interest and the Alperts are also to disgorge any commissions, fees, or profits they received in connection with any financing they arranged for or provided to plaintiffs in connection with plaintiffs' Phase II and BJV XVI and XXI purchases; and it is

FURTHER ORDERED that for the reasons stated in my Memorandum Opinion of this date, I am denying plaintiffs' claims under the remaining counts of their Complaint and the aforesaid claims be and hereby are dismissed; and it is

FURTHER ORDERED that the Counterclaims of defendant Lehman be and hereby are dismissed; and it is

FURTHER ORDERED that with respect to mortgage and promissory notes plaintiffs issued to finance their purchase of the 37 Baltimore properties held in the name of A & M and BJVs XVI and XXI, to the extent these notes are held by third party bona fide purchasers for value, I find that these are valid obligations; and it is

FURTHER ORDERED that by further Order I will appoint a Special Master to: (1) determine the amounts of monies which the Lehman and Alpert defendants owe plaintiffs; (2) liquidate the 37 Baltimore properties currently in the Bankruptcy proceedings before me; (3) use the monies disgorged by the Lehman and Alpert defendants and the monies obtained from the sale of these 37 Baltimore properties to pay plaintiffs' creditors; and it is

FURTHER ORDERED that court costs are assessed against the Lehman and Alpert defendants but that the parties shall pay their own attorneys' fees; and it is

FURTHER ORDERED that a hearing be held in this matter on June 19, 1989, at 4:00 p.m. in Courtroom 17 of the United States District Court, Third and Constitution Avenue, N.W., Washington, D.C. to further explore the manner and method for final disposition of this matter; and it is

FURTHER ORDERED that the court shall retain jurisdiction of this matter to order such other and further relief as may be appropriate.